**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 00-50092

THERESA M. SILER-KHODR,

Plaintiff-Appellee,

versus

THE UNIVERSITY OF TEXAS HEALTH SCIENCE
CENTER SAN ANTONIO; ET AL.,

Defendants,

and

THE UNIVERSITY OF TEXAS HEALTH SCIENCE
CENTER SAN ANTONIO,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

August 24, 2001

Before POLITZ, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The University of Texas Health Science Center San Antonio ("UTHSCSA" or the "University") appeals from a final judgment awarding Dr. Theresa M. Siler-Khodr ("Siler-Khodr") $91,000 back pay and $20,000 of compensatory damages, including costs and prejudgment interest,

because the jury found that UTHSCSA had discriminated against Siler-Khodr on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and paid her unequally in violation of the Equal Pay Act, 29 U.S.C. § 206(d) ("Equal Pay Act" or "EPA"). For the following reasons, we affirm the judgment.

## FACTUAL & PROCEDURAL BACKGROUND

Siler-Khodr began her career at UTHSCSA in the Department of Obstetrics and Gynecology ("Ob/Gyn Department") as an assistant professor in 1976. She has a Ph.D. in biochemistry, and she is a reproductive endocrinologist specializing in the area of hormones involved with the female reproductive system. Siler-Khodr primarily conducts laboratory research in this field. She also publishes the results of her research, supervises Fellows, and teaches classes. She has also directed clinical and research laboratories. Siler-Khodr became a Full Professor with tenure in 1986, and her supervisor is Dr. Robert Schenken ("Schenken").

Dr. Sydney Shain ("Sydney") is also in the Department and joined the University in 1989. According to UTHSCSA, Sydney was hired in an effort to retain Dr. Rochelle Shain ("Rochelle"), Sydney's wife and one of the four Ph.D. researchers in the Ob/Gyn Department. Rochelle informed Dr. Carl Pauerstein ("Pauerstein"), chair of the Department since 1979, that her husband wanted to leave his job at the Southwest Foundation for Biological Research in San Antonio where he earned $80,000 per year. Pauerstein offered Sydney a job with the University at a salary of $83,000, in part, because he was concerned that Sydney would seek employment outside of San Antonio, causing Pauerstein to lose Rochelle. Siler-Khodr's salary at the time was $64,354. The University also justifies Sydney and Siler-Khodr's difference in pay by asserting that Sydney has been more successful than Siler-Khodr in obtaining grant funding.

2

The University currently pays Sydney approximately $20,000 per year more than Siler-Khodr. He, however, like Siler-Khodr, 1) has a Ph.D. in biochemistry; 2) primarily conducts laboratory research regarding reproductive endocrinology; 3) publishes the results of his research; 4) supervises departmental Fellows; 5) teaches classes; and 6) is supervised by Dr. Schenken. Similarly, Pauerstein testified at trial that Siler-Khodr and Sydney have essentially the same duties and responsibilities.

Siler-Khodr filed suit in state district court against UTHSCSA, alleging in part violations of Title VII and of the EPA. The University subsequently removed to federal court. At trial, Siler-Khodr presented two studies: 1) the Women's Faculty Association Report conducted by the University in 1994 and 2) a report and testimony of Dr. Mary Gray ("Gray"), an expert statistician and Full Professor of mathematics and statistics at American University, in which she conducted a multiple regression analysis that controlled for a variety of factors.

Both reports indicated that gender significantly affected faculty salaries at the University. After adjusting for confounding factors such as rank, degree, tenure, duration in the institution and age, women tended to earn lower salaries than men. The reports studied salaries university-wide, and neither of them distinguished faculty salaries among medical specialities. The University contends that the Women's Faculty Association report was inherently flawed since, for example, more women tend to be pediatricians than surgeons at medical schools across the country and at UTHSCSA, and surgeons make considerably higher salaries than pediatricians. Moreover, UTHSCSA argues that the report did not analyze salaries within the Ob/Gyn Department and mentioned nothing regarding Siler-Khodr's salary. The University also asserts that Gray's report speaks only to the salary structure throughout the University. The report does not speak to the Ob/Gyn Department or the medical school in particular and does not pertain to Siler-Khodr's individual salary. In response, Siler-Khodr

3

contends that the University offered no expert testimony of its own at trial. Dean James Young ("Dean Young"), dean of the Medical School, however, testified at trial that he disagreed with the Women's Faculty Association study's conclusion. The University also cross-examined Gray's report.

A jury subsequently returned a verdict for Siler-Khodr on the issues of sex discrimination under Title VII and unequal pay under the Equal Pay Act. In addition to ordering back pay in the amount of $91,000 and compensatory damages in the amount of $20,000, it also ordered the University to equalize Siler-Khodr's compensation to that of Sydney and to pay her all sums necessary to accomplish that equalization retroactive to the date the jury returned the verdict. The district court further awarded Siler-Khodr an additional $91,000 in liquidated damages in keeping with the jury's finding under the Equal Pay Act, as well as reasonable attorneys' fees. UTHSCSA moved for a judgment as a matter of law, pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, that the district court denied. The University now appeals.

DISCUSSION

I.     Rule 50(a) Motion and the Sufficiency of Evidence

Rule 50(a) states that "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law. . . ." FED. R. CIV. P. 50(a). This Court reviews de novo the trial court's ruling on a Rule 50(a) motion. Travis v. Bd. of Regents of the Univ. of Texas Sys., 122 F.3d 259, 263 (5th Cir. 1997). Moreover, in reviewing a Rule 50(a) motion, this Court "should review all of the evidence in the record . . . [but] must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prod., Inc.,

4

530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 150-51 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

The district court refused to grant the University's Rule 50(a) motion for a judgment as a matter of law on Siler-Khodr's claims alleging violations of Title VII and the EPA. Title VII states that it is unlawful "to discriminate against any individual with respect to his compensation . . . because of such individual's sex." 42 U.S.C. § 2000e-2(a). Hence, a Title VII claim alleges "individual, disparate treatment." Plemer v. Parsons-Gilbane, 713 F.2d 1127, 1135 (5th Cir. 1983). Because the facts in a particular Title VII case will differ, the evidence necessary to prove a prima facie case of discrimination under Title VII will vary. Id. However, this Court has noted that although a plaintiff may present:

> statistics evidencing an employer's pattern and practice of discriminatory conduct, which "may be helpful to a determination of whether" the alleged discriminatory act against the plaintiff "conformed to a general pattern of discrimination against" members of a prot ected group. . . . that evidence is "not determinative of an employer's reason for the action taken against the individual grievant."

Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) and Terrell v. Feldstein Co., 468 F.2d 910, 911 (5th Cir. 1972)).

In contrast, the EPA has a higher threshold, requiring that an employer not discriminate "between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). In short, it demands that equal wages reward equal work. Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). Once a plaintiff has made her prima facie case by

5

showing that an employer compensates employees differently for equal work, the burden shifts to the defendant to "prove by a preponderance of the evidence that the wage differential is justified under one of the four affirmative defenses set forth in the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production;  or (4) any other factor than sex." Kovacevich v. Kent State Univ., 224 F.3d 806, 826 (6th Cir. 2000) (citing 29 U.S.C. § 206(d)(1)).  The EPA's affirmative defenses have been incorporated into Title VII by the Bennett Amendment to the Act.  Id. at 828.  "Generally, [however,] a Title VII claim of wage discrimination parallels that of an EPA violation."  Id.

A.    Statistics

The University contends that the trial court erred when it failed to grant its Rule 50(a) motion because the evidence was legally insufficient to support the jury's findings of sex discrimination and unequal pay.   It asserts that the two reports that Siler-Khodr presented regarding gender disparities in faculty salaries showed neither discrimination in the Ob/Gyn Department nor by Pauerstein. UTHSCSA asserts that Siler-Khodr, therefore, failed to prove intentional discrimination under Title VII.  As supporting authority, the University cites three cases, Zahorik v. Cornell University, 729 F.2d 85, 95 (2d Cir. 1984), Pollis v. New School for Social Research, 132 F.3d 115, 121-23 (2d Cir. 1997) (holding that plaintiff's statistics did not support an inference of discrimination when the statistical group was comprised of individuals not fairly comparable to the plaintiff), and this Court's recent opinion in Wyvill v. United Co. Life Ins. Co., 212 F.3d 296 (5th Cir. 2000).

The University, however, fails to mention Plemer, a Fifth Circuit case almost directly on point. Moreover, the cases that UTHSCSA cites are inapposite.  First, the Fifth Circuit stated in Plemer, a case with facts quite similar to those in the instant case, that

6

> [i]f an employee establishes by statistics that an employer had a discriminatory practice or policy toward employees of the claimant's gender, the court may infer that the employer's justification for an action it took against the plaintiff was merely pretext and that the action was really taken on the basis of the plaintiff's gender in conformance with the general practice of discrimination.

713 F.2d at 1137.

Indeed, this Court stated that the district court should have considered the plaintiff's statistics as evidence that rebutted the employer's evidence that the wage disparity between her and another male employee for the same position hinged on a "factor other than sex." Id.

Second, the study in Zahorik did not consider discriminatory wage structures, and the statistics were limited in numbers, remote in time, based upon the statisticians' "estimates," and reflected a deliberate exclusion from consideration of nearly 50 tenure decisions. Third, Pollis is distinguishable from the instant case. The petitioner's statistics in that case failed because her sample group was too small, consisting of only eight faculty members, and too spread out over time, covering the years 1974-1993, to be probative of anything. In contrast, both studies that Siler-Khodr presented analyzed salary data of hundreds of faculty members, university-wide, during a single year. Fourth, Wyvill may be distinguished because it did not even involve statistics, but anecdotal evidence of how other individuals had been treated by the employer.

Furthermore, the Supreme Court has specifically addressed the University's arguments regarding the regression analysis in Gray's report. The Court concluded that "[w]hile the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors 'must be considered unacceptable as evidence of discrimination.'" Bazemore v. Friday, 478

7

U.S. 385, 400 (1986) (citation omitted). "Normally, failure to include variables will *affect the analysis' probativeness, not its admissibility*." Id. (emphasis added). Furthermore, the Court stated that "[a] plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence." Id.

Thus, although both reports do not study faculty salaries by medical sub-specialty or study Pauerstein's individual conduct, they are sufficient to prove discrimination under a Title VII claim according to Supreme Court and this Court's precedent. Moreover, it is noteworthy that the University failed to present evidence at trial rebutting the conclusions of the reports that Siler-Khodr presented into evidence. In contrast, Siler-Khodr put forth ample evidence to overcome the Rule 50(a) motion, including her testimony, Gray's testimony, and the studies themselves. Finally, the Supreme Court has noted that the inclusion of specific variables does not affect the studies' probativeness as much as their admissibility. Therefore, regarding the studies in favor of Siler-Khodr, we hold that the district court did not err in denying the Rule 50(a) motion, given that it is the province of the jury, not the court, to make credibility determinations regarding the reports.[1] Reeves, 530 U.S. at 122.

 

B.      Affirmative Defenses

1. Grant-Obtaining Abilities

---

[1] For the same reasons, the University's arguments regarding the issue of whether the trial court erred by admitting into evidence unreliable and irrelevant statistical evidence and therefore abused its discretion and subst antially prejudiced the University by forcing it to defend allegations of discrimination against all female faculty in the University, are unpersuasive.

The University offered two affirmative defenses at trial to explain the wage differential alleged in Siler-Khodr's EPA and Title VII claims: 1) Sydney was more productive in his ability to secure grants than Siler-Khodr and 2) Pauerstein offered Sydney a higher salary than that of Siler-Khodr as an incentive to retain his wife, Rochelle, a professor in the department since 1976, based on Sydney's prior salary and market forces. With respect to the first affirmative defense, Pauerstein testified at trial that the single most important criterion he uses to allocate money for raises is success in obtaining grant funding.[2]

Siler-Khodr testified at trial that she had brought in $2.8 to $2.9 million in grants over the course of her tenure at the University as a principal investigator. In contrast, Sydney testified that he had obtained in excess of $1.9 million in grant money to the University. Pauerstein, however, testified that the department had attributed $2.9 million in grant funding, all from NIH, to Sydney as a Principal Investigator ("PI") during the years 1989-1999. During the period 1975-1999, however, Pauerstein testified that Siler-Khodr obtained only $600,000 in grant funding as a principal investigator, all from NIH.

Sydney also testified that although he had not obtained any new grant funding since 1995, he had received raises since that time. Pauerstein testified that he did not recommend a raise for Sydney in 1999 because he had been unable to receive a grant. Similarly, Pauerstein testified that he did not recommend Siler-Khodr for a raise in 1999 because her track record in bringing in grant support was not "excellent," although she had obtained grant support for that year. In 1991, however, Pauerstein

---

[2] He also stated at trial that grants from the National Institutes of Health ("NIH") are the most prestigious grants, as they are peer-reviewed.

recommended a raise for Siler-Khodr that was over five percent greater than that which he recommended for Sydney.[3]

Siler-Khodr argues that the University's grant-obtaining defense is mere pretext for the discrepancy between her and Sydney's compensation. She notes, in contrast to Pauerstein's testimony regarding the importance of obtaining grants in evaluating salary raises, that Dean Young wrote in a 1996 letter that "[t]here are no institutionally specified factors to consider as a basis for determining total annual compensation." Siler-Khodr also contends that the University presented neither a campus-wide nor departmental policy showing that this factor had ever been used as a wage-setting criterion. Although she was informed in her 1996 and 1997 faculty evaluations that she needed to improve her ability to obtain further grant funding for research studies, there is no evidence in the record that Siler-Khodr had been criticized in her evaluations for not obtaining sufficient funding prior to 1996 and 1997. The record also reflects that she had not been informed that she was paid less because of her purportedly lesser ability to obtain grants.

A review of the record therefore indicates that Siler-Khodr presented sufficient evidence at trial to support the jury's finding that the University's grant-obtaining affirmative defense was pretext for its paying Siler-Khodr a lower wage than Sydney. We, therefore, hold that the district court did not err.

---

[3] Pauerstein has recommended Siler-Khodr for merit raises in fifteen out of the seventeen years that raises were available. Between the years 1991 and 2000, Siler-Khodr received raises that increased her salary by 28.8% and Sydney received raises that increased his salary by 30%.

2. <u>Prior Salary/Market Forces</u>

The trial court similarly did not err when it denied the University's motion for judgment as a matter of law because the record shows that UTHSCSA's affirmative defense to Siler-Khodr's claims based on Sydney's prior salary and market forces is pretext as well and is easily rebutted. Pauerstein testified that he offered a faculty position to Sydney because he wanted to retain Rochelle as a member of the Ob/Gyn Department. Sydney testified at trial that his primary reason for accepting employment at the University was that he had tired of the responsibilities at his job in private industry and he wanted to pursue academic research. Moreover, although he testified that there were no negotiations regarding his salary offer with the University, he also testified that had his salary offer not been in excess of $80,000, he probably would have asked for a higher salary. The trial court, however, did not err when it adjudged that the evidence was legally sufficient to rebut this affirmative defense because the record reflects that Sydney's primary reason for accepting Pauerstein's offer was not related to salary.

The University also argues that market forces dictated a higher salary for Sydney. It relies on the testimony of Dean Young, who stated that the wage differential is justified, given that the salary paid to a new employee is driven almost entirely by market forces- the University must expend resources to attract qualified individuals in a market where other organizations have the same goal. This Court has previously stated that the University's market forces argument is not tenable and simply perpetuates the discrimination that Congress wanted to alleviate when it enacted the EPA. See Brennan v. City Stores, Inc., 479 F.2d 235, 241 n.12 (5th Cir. 1973) (stating that factors other than sex such as "the tighter market for salesmen and male tailors" does not justify "its hiring of men with such skills at a rate higher than that paid to obtain women of similar skills").

11

II.    Constitutionality of the EPA

The University asserts that Congress exceeded its authority when it abrogated the states' Eleventh Amendment immunity in the EPA, in light of the Supreme Court's recent opinion in Kimel v. Florida Bd. of Regents, 528 U.S. 62 (2000).    Kimel held that the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, although containing a clear statement of Congress's intent to abrogate state immunity, was not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment to abrogate state immunity and extend liability to the states. Kimel, 528 U.S. at 78-80.  In addition, UTHSCSA argues that Congress not only unconstitutionally invoked its authority under Article I to abrogate state immunity, but it also lacked authority to abrogate state immunity under § 5 because Congress failed to find widespread constitutional violations by the states when it amended the EPA to extend liability to the states in 1974.[4]   The University consequently argues that the Act fails the congruence and proportionality test outlined in City of Boerne v. Flores, 521 U.S. 507, 519-20, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997).

This Court reviews de novo the question of whether a state is entitled to immunity under the Eleventh Amendment.  Ussery, 150 F.3d at 434.  This Court in Ussery explicitly upheld the constitutionality of the EPA under the Eleventh Amendment in a similar challenge when it stated, "[b]y amending the EPA to include the States as employers, Congress sought to eliminate such discrimination by the States themselves . . . [and] it goes without saying that the substantive provisions of the Fourteenth Amendment prohibit the States from discriminating on the basis of

---

[4] In 1963, Congress enacted the EPA pursuant to its Commerce Clause powers, and it limited liability under the EPA to private employers.  Ussery v. Louisiana, 150 F.3d 431, 435 (5th Cir. 1998). In 1974, when Congress amended the EPA to apply to the states, however, it did not provide a definitive statement regarding the Constitutional authority under which it acted.  Id.

12

gender." Id. at 437. Moreover, this Court in Ussery expressly rejected the argument that the University makes regarding Congressional reliance on Article I to amend the EPA to include the states. It stated that "the 1974 Amendments were a separate statute, and we must examine that statute and its legislative history to determine if Congress stated its intent to legislate under any particular constitutional provision." Id. at 436 n.2.[5]

We find that in the wake of Kimel, the EPA nevertheless does not violate the Eleventh Amendment of the Constitution because it is congruent and proportional "between the injury to be prevented or remedied and the means adopted to that end" and is therefore an appropriate use of Congress's § 5 power of the Fourteenth Amendment. City of Boerne, 521 U.S. at 520. Kimel held that the ADEA was not an appropriate use of Congress's § 5 power because it was not congruent and proportional to the means employed by the Equal Protection Clause to prohibit discrimination by the states on the basis of age. Kimel, 528 U.S. at 82-86. The Court essentially found that the discriminatory conduct that is prohibited by the ADEA, as applied to the states, is disproportionate to similar conduct prohibited by the Constitution's Equal Protection Clause. Id.

The Kimel Court distinguished between state discrimination on the basis of age, which requires rational review under Equal Protection, and state discrimination on the basis of race or gender, which requires higher standards of review and "a tighter fit between the discriminatory means and the legitimate ends they serve." Id. at 84. Importantly, other courts to consider this issue post-

---

[5] Other courts examining this issue pre-Kimel have agreed with the Fifth Circuit's holding in Ussery. See, e.g., Varner v. Illinois State Univ., 226 F.3d 927, 935 n.4 (7th Cir. 2000), cert. denied, __ S. Ct.__, 2001 WL 121186 ( Jun. 11, 2001) (No. 00-1277).

Kimel have been similarly swayed.[6] See Varner, 226 F.3d at 934-35; Hundertmark v. Florida Dept. of Transp., 205 F.3d 1272, 1276-77 (11th Cir. 2000); Kovacevich, 224 F.3d at 819-21; Anderson v. State Univ. of New York, 107 F. Supp. 2d 158, 165 (N.D.N.Y. 2000).

Moreover, although the Kimel Court discussed the lack of legislative findings regarding unconstitutional age discrimination by the states, it nonetheless stated "that lack of support is not determinative of the § 5 inquiry." Kimel, 528 U.S. at 91. Other courts examining the lack of legislative findings regarding the discriminatory practices by the states on the basis of gender have found this argument unpersuasive, as the "historical record clearly demonstrates that gender discrimination is a problem that is national in scope," whether or not committed in the public sector. Varner, 226 F.3d at 935-36; see also Kovacevich, 224 F.3d at 821 n.6 (stating that "we are satisfied by Congress's more general finding in enacting the original EPA that wage differentials are due to outmoded beliefs about the relative value of men's and women's work . . . combined with the fact that women have been subjected to a history of purposeful unequal treatment more generally" (internal citations omitted)). Thus, we hold that the EPA is constitutional under the Eleventh Amendment.

---

[6] Similarly, the Court's recent decision in Board of Trustees of the University of Alabama, et. al. v. Garrett, et al., 121 S. Ct. 955 (2001), supports our holding. The Garrett Court held that the Americans with Disabilities Act ("ADA") unconstitutionally abrogates the states' Eleventh Amendment immunity because 1) discrimination in employment against the disabled is reviewed under rational basis for purposes of the Equal Protection Clause and 2) the legislative record of the ADA fails to reveal that Congress identified a pattern of irrational state discrimination. Id. at 963-66. Here, gender, unlike disability, is reviewed under a stricter test in Equal Protection, which the Kimel Court took pains to address. See Kimel, 528 U.S. at 84. Moreover, in contrast to disability, the historical record clearly documents state discrimination on the basis of gender. Hence, the lack of further Congressional findings regarding gender discrimination by the states is less significant in importance.

CONCLUSION

We affirm the district court's denial of UTHSCSA's motion for judgment as a matter of law because its judgment was legally sufficient to support the jury's findings of prima facie sex discrimination under Title VII and unequal pay under the EPA. We also agree with our sister circuits that the EPA does not violate the Eleventh Amendment of the Constitution in light of the Supreme Court's decision in <u>Kimel</u>.

AFFIRMED.

DeMOSS, Circuit Judge, concurring in part and dissenting in part:

Insofar as the majority opinion affirms the judgment of the district court and the jury verdict authorizing recovery against the University for discrimination under Title VII (42 U.S.C. § 2000e et seq.), I reluctantly concur.  The holding of the Supreme Court in *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), which held that suits brought in federal court by a private citizen against a state for recovery of damages pursuant to Title VII were not barred by the Eleventh Amendment because in adopting the 1972 Amendments to the Civil Rights Act, Congress expressly acted pursuant to § 5 of the Fourteenth Amendment, is controlling.  While I see substantial inconsistencies between the Supreme Court's holding in *Fitzpatrick v. Bitzer* and several recent Supreme Court cases, I have not found anything in those recent cases that would overrule the holding in *Fitzpatrick v. Bitzer*, and we are, therefore, bound by that holding until the Supreme Court itself modifies or overrules it.

As to the portion of the majority opinion that affirms the district court's award of money damages based on the jury finding of a violation of the Equal Pay Act of 1963, Pub. L. No. 88-38, 77 Stat. 56 (codified as amended at 29 U.S.C. § 206(d)), I respectfully dissent.  I write to explain why I believe the

majority opinion is in error in concluding that, in 1974 when Congress amended the provisions of the Fair Labor Standards Act (FLSA) so as to give individual state employees a cause of action in federal court against a state, Congress relied upon § 5 of the Fourteenth Amendment.

## I.  Historical Review

I think a brief historical review of the key statutory provisions involved in this appeal will be helpful to understanding my dissent.  The Fair Labor Standards Act (codified as amended at 29 U.S.C. §§ 201-219) (hereinafter the FLSA) as originally enacted in 1938, contained a section defining congressional findings and declaration of policy (§ 202); a section defining various terms (§ 203); a section fixing the minimum wage for various categories of employees (§ 206); a section defining the maximum number of hours in a work week and providing for payment at a higher rate for hours worked in excess of that maximum (§ 207); a section defining child labor limitations (§ 212); a section defining various exemptions from coverage (§ 213); a section defining prohibited acts (§ 215); a section defining penalties and methods of recovery (§ 216); and a section defining various injunctive proceedings (§ 217).  It should be noted that § 202 is still in place and is an express and explicit statutory statement by Congress of its findings of adverse impacts on interstate commerce and its express declaration that it

17

was exercising its power to regulate commerce among the states in order to eliminate these adverse conditions. There is no need therefore to explore the legislative history of FLSA on the issue of what constitutional power Congress relied upon in enacting it. It should also be noted that at the time of its original passage, the FLSA expressly excluded a state as being within the definition of "employer" and excluded "state employees" as being included within the definition of employees. It seems absolutely clear to me, therefore, that at the time of its original enactment, the FLSA was an exercise of the powers of Congress under the Interstate Commerce Clause, Article 1 Section 8 of the United States Constitution.

In 1963, Congress enacted the "Equal Pay Act of 1963", which amended 29 U.S.C. § 206 of the FLSA by adding thereto a new subsection (d). This amendment to § 206 of the FLSA was set forth in § 3 of the Equal Pay Act of 1963. Section 2 of the Equal Pay Act of 1963 contains express findings by Congress that the existence "of wage differentials based on sex" caused various negative impacts on industries engaged in commerce or in the production of goods for commerce; and contains an express declaration by Congress that it was exercising "its power to regulate commerce among the states" to correct these adverse impacts. Just as in the case of the enactment of the FLSA itself, it seems uncontrovertible to me that in enacting the Equal Pay Act

18

of 1963 which added new subsection (d) to § 206 of the FLSA, Congress was acting pursuant to its Interstate Commerce Clause powers to remedy specific adverse effects on interstate commerce caused by "wage differentials based on sex." In the House Report regarding the Equal Pay Act of 1963, the Committee on Education and Labor makes the following comments as to the purpose and major provisions of the bill that became the Equal Pay Act of 1963:

> The bill (H.R. 6060) would add one additional fair labor standard to the act; namely, the employees doing work should be paid equal wages, regardless of sex.
>
> Because of the long history and experience of Government and business and workers with the Fair Labor Standards Act, a simple expansion of that act to include the equal pay concept offers the most efficient and least difficult course of action.
>
> . . . .
>
> Such utilization serves two purposes: First, it eliminates the need for a new bureaucratic structure to enforce equal pay legislation; and second, compliance should be made easier because both industry and labor have a long-established familiarity with existing fair labor standards provisions.
>
> Perhaps the most worthy result in this approach is in the question of coverage. This bill neither extends nor curtails coverage of the Fair Labor Standards Act but simply provides that those employers and employees who are presently covered by that act shall be covered by the new provisions relating to equal pay for equal work, regardless of sex.

H.R. Rep. No. 88-309, at 1-2 (1963), *reported in* 1963 U.S.C.C.A.N. 687, 687-89.

19

The text of new subsection (d) of § 206 expressly provides that the new equal pay for equal work standard will apply to an "employer having employees subject to any provisions of this section [§ 206]." As a result, an employer who is not obligated to pay the minimum wage specified under § 206 is not obligated to comply with the equal pay for equal work provision. Finally, I would point out that in 1963 at the time of enactment of the Equal Pay Act of 1963, under the express terms of the FLSA, the term "employer" did not include a state and the term "employee" did not include a state employee.

The final source of congressional action that must be considered in resolving the issues in this appeal is the Act entitled "Fair Labor Standards Amendments of 1974" [hereinafter "1974 Act"], Pub. L. No. 93-259, 88 Stat. 53. The 1974 Act consists of 29 separate sections covering 25 pages. Section 1 of the 1974 Act simply provides the name by which the Act may be cited and states that unless otherwise expressly specified any reference to an amendment or repeal refers to sections or provisions of the Fair Labor Standards Act of 1938 (29 U.S.C. §§ 201-219). Section 29 of the 1974 Act provides for effective date and implementation by the Secretary of Labor. Section 28 of the 1974 Act makes various amendments to the text of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630 et seq. These changes in § 28 are the source of the controversies in the Supreme Court's

20

recent decision in *Kimel v. Florida Board of Regents*, 528 U.S. 62. Section 2 through § 27, therefore, are the portions of the 1974 Act that make changes in and additions to the Fair Labor Standards Act of 1938. The most relevant changes to our decision here in *Siler-Khodr* are:

(a) Section 6(a)(1) of the 1974 Act which made various changes to the statutory definitions in § 203 of the FLSA so as to: (1) include a new defined term of "public agency" which includes "a state or a political subdivision of a state"; (2) amends the term "employer" to include "a public agency"; and (3) defines the term "employee" to include "an employee of a public agency except those who are covered by civil service or who hold a public elective office."

(b) Section 6(d)(1) of the 1974 Act which changes the second sentence of § 16(b) [29 U.S.C. § 216(b)] to read as follows:

> Action to recover such liability may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.

This change was made to satisfy the holding of the Supreme Court in *Employees of the Department of Health of Missouri v. Missouri*, 93 S. Ct. 1614, which was decided

in April 1973, just about one year prior to the issuance of the committee report.  In this suit, various employees of the State of Missouri's health facilities and agencies brought suit in the federal district court for overtime pay due them under § 16(b) of the FLSA.  The district court dismissed the suit as being an unconsented action against the State of Missouri barred by the Eleventh Amendment, and the Court of Appeals affirmed.  The Supreme Court held that although amendments to the FLSA in 1966 extended statutory coverage to state employees in hospitals, the legislative history failed to show a congressional purpose to deprive the state of its constitutional immunity to suit in a federal forum by employees of its non-profit institutions because § 16(b) of the FLSA as it existed at that time did not expressly authorize suit by a state employee against the state in federal court.  This amendment to § 16(b) of FLSA satisfies one of the grounds upon which the Supreme Court in *Employees v. Missouri* held that "Congress did not lift the sovereign immunity of the states under the FLSA." But even so, some other statements by the *Employees* Court are worth noting, as follows:

> Where employees in state institutions not conducted for profit have such a relation to interstate commerce that national policy, of which Congress is the keeper, indicates that their status

should be raised, Congress can act. And when Congress does act, it may place new or even enormous fiscal burdens on the States. Congress acting responsibly would not be presumed to take such action silently....

But we have found not a word in the history of the 1966 amendments to indicate a purpose of Congress to make it possible for a citizen of that State or another State to sue the State in the federal courts....It is not easy to infer that Congress in legislating pursuant to the Commerce Clause, which has grown to vast proportions in its applications, desired silently to deprive the States of an immunity they have long enjoyed under another part of the Constitution....

... In this connection, it is not amiss to note that § 16(b) allows recovery by employees, not only of the amount of unpaid wages but of an equal amount as liquidated damages and attorneys' fees. It is one thing, as in **Parden**, to make a state employee whole; it is quite another to let him recover double against a State. Recalcitrant private employers may be whipped into line in that manner. But we are reluctant to believe that Congress in pursuit of a harmonious federalism desired to treat the States so harshly.

93 S. Ct. at 1618-19.

(c) In § 7 of the 1974 Act, various changes in sections of the FLSA were made in order to bring "domestic service workers" under the provisions of that Act. Of these changes the most significant to our current analysis is the change made by § 7(a) of the 1974 Act, which inserts the following new sentence in § 202(a) of the FLSA: "That Congress further finds that the employment of persons in domestic service in households affects

23

commerce." This change clearly indicates to me that Congress thought about the subject, and the basis of authority, of what changes, if any, it needed to make in § 202 of the FLSA, the section that sets forth its statements of effects on interstate commerce justifying its exercise of the power to regulate commerce.

While it is true that the 1974 Act, unlike the FLSA and the Equal Pay Act of 1963, does not contain express and explicit language regarding impacts on interstate commerce and that the Act was an exercise of the interstate commerce power, I think it is sheer speculation to conclude as the panel majority does, and as the panel in **Ussery v. Louisiana** 150 F.3d 431 (5th Cir. 1998) did, that Congress acted on the basis of some other power in enacting the 1974 Act. In the first place, as mentioned earlier, the amendment of § 202 of the FLSA relating to the inclusion of domestic service workers under the FLSA, clearly indicates that Congress continued to believe that its authority for the adoption of the FLSA was its interstate commerce power. But equally, if not more persuasive, is the fact that the House Education and Labor Committee Report specifically indicates that Congress was acting under its interstate commerce power. *See* H.R. Rep. No. 93-913 (1974), *reprinted in* 1974 U.S.C.C.A.N. 2811. In the opening paragraph of this report, the Committee quoted verbatim § 202 of the FLSA to indicate the basic policy of the FLSA. The Committee

24

report then states under the heading "Purpose of the Legislation" as follows:

> The bill seeks to implement the policy of the Act [the FLSA] by (1) providing an increase in the minimum wage rate, and (2) extending the benefits and protection of the Act to workers engaged in commerce, or in the production of goods for commerce or employed in enterprises engaged in commerce or in the production of goods for commerce.

*Id.* Later on in this same section of the Committee report, there is a very cursory reference: "The bill extends the minimum wage and overtime coverage of the Act to Federal, State and local government employees...." *Id.* Later on in the report in a section-by-section discussion of the main provisions of the bill, the report states:

> Sec. 6. Federal and State Employees. -- Amends definitions of the act to permit the extension of minimum wage and overtime coverage to Federal, State, and local public employees.

*Id.* Later on in this report, there is a two-page discussion of § 6 of the bill, which would extend "minimum wage and overtime coverage to about five million nonsupervisory employees in the public sector not now covered by the Act." *Id.* In this discussion, there is no specific reference to the "equal pay for equal work" provisions of subsection (d) of § 206; there is no reference to "discrimination on the basis of sex" by the states against their employees; there is no reference to unconstitutional state laws that foster discrimination in pay on the basis of sex; there is no reference

25

to states denying equal protection of the laws because of wage rates differing on the basis of sex; and finally there is no discussion or finding by the Committee that pay differentials on the basis of sex between workers doing the same job for the states requires exercise by the Congress of its powers under § 5 of the Fourteenth Amendment. There is a lengthy portion of this report which constitutes an overview of the history of the FLSA and various Supreme Court decisions relating thereto. Since this committee report was issued in March 1974, it is not surprising that this historical review of the Act and Supreme Court decisions generally arrives at the conclusion that the Congress has the power under the Interstate Commerce Clause to make the extension of the Fair Labor Standards Act to state employees as contemplated by the 1974 Act. This discussion focused primarily on the Supreme Court decision in *Maryland v. Wertz*, 88 S. Ct. 2017 (1968). One of the issues involved in *Wertz* was whether or not the state's sovereign immunity was abrogated by certain amendments made in 1966 that extended wage and hour coverage to employees of hospitals, mental institutions, schools, and institutions of higher education regardless of whether these institutions were public or private or operated for profit or not for profit. While affirming the lower court's decision not to enjoin enforcement of these provisions, the Supreme Court in *Wertz* expressly reserved for later determination

26

all questions of the state's sovereign immunity from suit guaranteed by the Eleventh Amendment.

In light of the foregoing, I come to the following conclusions:

1.   In adopting the FLSA and the Equal Pay Act of 1963, Congress expressly and explicitly, in the statutes themselves, relied upon its powers under the Interstate Commerce Clause of the Constitution.

2.   In passing the 1974 Act, Congress acted under its authority under the Interstate Commerce Clause.   While this conclusion is not as express and as explicit as that regarding the FLSA and the Equal Pay Act of 1963, there is overwhelming evidence upon which to draw such a conclusion, and there is no evidence that would support a contrary conclusion.

3.   From my review of the statutory language in each of these legislative enactments and their respective legislative histories, I can see absolutely no basis for treating the provisions of § 206(d) separately and apart from the remainder of the Fair Labor Standards Act for purposes of determining the constitutional power upon which Congress purported to act.

I disagree completely with my colleagues in the majority who relied upon the prior opinion of this Court in **Ussery**, which relied upon prior opinions of other Circuit Courts, in attributing some sort of separate standing to the Equal Pay Act for purposes of

27

determining its constitutionality.  Once the bill which was labeled as the Equal Pay Act of 1963 was passed and its substantive amendment to § 206(d) incorporated in the U.S. Code, it became for all purposes and intents a portion of the Fair Labor Standards Act just as though it had been in the original Act.  In truth and in fact, the provisions of subsection (d) of § 206 could not be applied in any case without simultaneous reference to the other subsections of § 206, the definitions in § 203, the exemptions in § 213, and the remedies available in § 216.

## II.  The Impact of *Seminole Tribe*

No satisfactory disposition of the case now before us can be accomplished without giving full application to the decision of the Supreme Court in ***Seminole Tribe of Florida v. Florida***, 116 S. Ct. 1114 (1996).  In ***Seminole Tribe***, the Supreme Court made two holdings that control in this case.  First and foremost, the Supreme Court overruled its prior decision in ***Pennsylvania v. Union Gas Co.***, 109 S. Ct. 2273, in which a plurality of the Supreme Court held that Congress had the power under the Interstate Commerce Clause to abrogate the immunity that a State claims under the Eleventh Amendment from suits by private individuals for money damages.  After stating "[w]e feel bound to conclude that ***Union Gas*** was wrongly decided and that it should be, and now is, overruled," the Court went on to state:

28

> [W]e reconfirm that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government....The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction. Petitioner's suit against the State of Florida must be dismissed for a lack of jurisdiction.

*Seimole Tribe*, 116 S. Ct. at 1131-32.  The Act in question in this case was the Indian Gaming Regulatory Act, which imposed upon the states a duty to negotiate in good faith with an Indian tribe toward the formation of a compact and authorized a tribe to bring suit in federal court against a state in order to compel performance of that duty.  The Supreme Court determined that the language of the Act was sufficient to indicate Congress' clear intent to abrogate the state's sovereign immunity; notwithstanding that determination, the Court concluded that the Indian Commerce Clause of the Constitution does not grant Congress that power.  After making the "intention" determination, the Supreme Court said its inquiry was focused on one question: "Was the Act in question passed pursuant to a constitutional provision granting Congress the power to abrogate?"  *Id*. at 1125.

In my view, this precise question rephrased to fit the circumstances of this case is the determinative issue for this Court.  That question is "Was the 1974 Act passed pursuant to a

constitutional provision granting Congress the power to abrogate?" That question involves two subordinate questions as follows:

a. Under what provision of the Constitution was the 1974 Act passed; and

b. Does that constitutional provision grant Congress the power to abrogate the state's Eleventh Amendment immunity from suit?

For the reasons stated earlier in this dissent, I have no trouble at all concluding that the 1974 Act was passed pursuant to Congress' powers under the Interstate Commerce Clause. And in my view, the answer to the second subquestion is controlled by *Seminole Tribe* and must be "no". Answers to these questions are strictly factual determinations to be made on the basis of the statutory text and the legislative history as of the time of "passage" or "enactment" of the Act in question. I make this point expressly because I disagree with the panel majority's reliance on our prior decision in *Ussery*, which relied on an Eighth Circuit case and stated:

> *Seminole Tribe* "requires us to make an objective inquiry, namely whether Congress <u>could have</u> enacted the legislation at issue pursuant to a constitutional provision granting it the power to abrogate." (Emphasis added.)

150 F.3d at 436 (quoting *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir. 1997). But this "could of, would of, should of" concept is totally inconsistent with the language of *Seminole Tribe*. The

30

question posed in *Seminole Tribe* does not say "could the Act in question have been passed pursuant to any constitutional provision granting Congress the power to abrogate"?  In *Seminole Tribe*, the Supreme Court determined that the Act in question (the Indian Gaming Regulatory Act) was passed pursuant to the constitutional provision authorizing Congress to "regulate commerce with Indian tribes," but that "Congress does not have the authority under the Constitution to make the State suable in federal court...."  116 S. Ct. at 1133.  Furthermore, the Court in *Seminole Tribe* went on to state:

> Nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known that § 2710(d)(7) was beyond its authority.  If that effort is to be made, it should be made by Congress, and not by the federal courts.

*Id*.  The majority opinion in *Seminole Tribe* does not get into any speculation as to whether § 5 of the Fourteenth Amendment could have provided the constitutional authority for the abrogation of states' Eleventh Amendment immunity which Congress proposed in the Indian Gaming Regulatory Act.  I think that it is a mistake and an erroneous application of Supreme Court precedent for the majority to go through the convoluted, semantical speculations as set forth in their opinion to come up with their conclusion that § 5 of the Fourteenth Amendment supports the abrogation of state immunity from private suits for money damages insofar as claims under 29 U.S.C. § 206(d) are concerned.  Accordingly, I would vacate the portions

31

of the judgment awarding damages under the Equal Pay Act.