# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 00-50092

_____

THERESA M. SILER-KHODR,

Plaintiff-Appellee,

VERSUS

THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER SAN ANTONIO, ET AL.,

Defendants,

THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER SAN ANTONIO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

May 16, 2002

ON PETITION FOR
REHEARING EN BANC

(Opinion August 24, 2001, 261 F.3d 542)

Before POLITZ, DeMOSS, and STEWART,
   Circuit Judges.

PER CURIAM:

Treating the petition for rehearing en banc as a petition for panel rehearing, the petition for panel rehearing is DENIED. The court having been polled at the request of one of the members of the court, and a majority of the judges who are in regular active service not having voted in favor (FED. R. APP. P. 35 and 5TH CIR. R. 35), the petition for rehearing en banc is DENIED.

JERRY E. SMITH, Circuit Judge, with whom HAROLD R. DEMOSS, JR., Circuit Judge, joins, dissenting from the denial of rehearing en banc:

I respectfully dissent from the court's failure to grant en banc reconsideration in this important case. As a result of this failure, we have lost an opportunity to bring our Eleventh Amendment jurisprudence into conformity with the Supreme Court's recent caselaw.

I.

In affirming a judgment under the Equal Pay Act ("EPA"), the panel majority rejected Texas's argument that application of the EPA to a state university violates the Eleventh Amendment. *Siler-Khodr v. Univ. Health Sci. Ctr.*, 261 F.3d 542 (5th Cir. 2000). Irrespective of whether particular judges like it, however, the Supreme Court has been giving more and more Eleventh Amendment protection to the states. The panel majority opinion takes no account of that trend.

The majority decision is inconsistent with the Supreme Court's Eleventh Amendment jurisprudence in two significant respects. First, as Judge DeMoss's dissent ably demonstrates, there is no indication that, when it enacted the EPA, Congress sought to invoke its powers under section 5 of the Fourteenth Amendment. *See Siler-Khoder*, 261 F.3d at 551-58 (DeMoss, J., dissenting in part, concurring in part). Because Congress almost certainly relied solely on its powers under the Commerce Clause, the EPA cannot pierce the states' sovereign immunity.

Second, even if Congress did properly invoke its section 5 powers, the EPA fails the "congruence and proportionality" test, which requires that section 5 legislation not be "so

out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne v. Flores*, 521 U.S. 507, 520, 531 (1997). Although section 5 does give Congress the power to enact "prophylactic" legislation that prohibits conduct going beyond that which in itself violates the Equal Protection Clause, section 5 legislation is unconstitutional if it "prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection . . . standard." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 86 (2000).

If the majority opinion were written on a blank slate, it would be even easier for me to urge en banc reconsideration followed by reversal. Appropriately, the majority relied in part on the fact that the constitutionality of the EPA has been upheld by five other circuits[1] and in *Ussery v. Louisiana*, 150 F.3d 431 (5th Cir. 1998). It is significant, however, that after deciding *Kimel*, the Court vacated and remanded two circuits' opinions upholding the EPA.[2] The Court has not yet granted certiorari in any of the cases upholding the

---

[1] *See Varner v. Ill. State Univ.*, 226 F.3d 927 (7th Cir. 2000) (*"Varner II"*), *cert. denied*, 533 U.S. 902 (2001); *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 819-21 (6th Cir. 2000); *Hundertmark v. Fla. Dep't of Transp.*, 205 F.3d 1272, 1274 (11th Cir. 2000); *O'Sullivan v. Minnesota*, 191 F.3d 965, 968 (8th Cir. 1999); *Anderson v. State Univ.*, 169 F.3d 117 (2d Cir. 1999), *vacated and remanded*, 528 U.S. 1111 (2000).

[2] *See Anderson v. State Univ.*, 169 F.3d 117 (2d Cir. 1999), *vacated and remanded*, 528 U.S. 1111 (2000); *Varner v. Ill. State Univ.*, 150 F.3d 706 (7th Cir. 1998) (*"Varner I"*), *vacated and remanded*, 528 U.S. 1110 (2000).

EPA since *Kimel*, but it seems likely that it does not regard the issue as settled and is only awaiting the emergence of a circuit split. Also, importantly, the Court has rejected only one relevant certiorari petition since *Kimel*.[3]

II.

A.

In enacting the EPA, Congress failed to invoke its powers under section 5. "Because such legislation imposes congressional policy on a state involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16 (1981). An intent to invoke section 5 powers cannot be attributed to an act that "nowhere states that is its purpose" and where such a purpose is not evident from the legislation's "language and structure" or legislative history. *Id.* at 17. For the reasons well laid out in Judge DeMoss's dissent, there is no indication that Congress sought to use its section 5 powers—and there is a great deal of evidence that it sought to use its powers under the Commerce Clause—when it enacted the 1974 amendments to the EPA extending it to cover the states. *Siler-Khodr*, 261 F.3d at 551-55 (DeMoss, J., dissenting).

Although the plaintiff may be right in supposing that Congress need not explicitly invoke section 5 in the text of the statute,[4] there must be at least some significant indication—in the text, structure, or legislative history—that it sought to use its section 5 powers. Congress cannot rely on section 5 without *any* indication that it intended to do so.

Very recently, the Court specifically refused to consider section 5 as a justification for the constitutionality of a statute where "[t]here is no suggestion in the language of the statute itself, or in the House or Senate Reports of the bill which became the statute that Congress had in mind" its Fourteenth Amendment powers. *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 642 n.7 (1999).[5] Even in *EEOC v. Wyoming*, 460 U.S. 226, 243 n.18 (1983), a decision heavily relied on by the plaintiff and by the United States as intervenor, the Court noted that "[i]t is in the nature of our review of congressional legislation defended on the basis of Congress's powers under Section 5 of the Fourteenth Amendment that we be able to discern some legislative purpose or factual predicate that supports the exercise of that power."

Although Supreme Court precedent may be equivocal as to *how much* indication of congressional intent is necessary to invoke section 5 properly, there is little doubt after *Florida Prepaid* that at least *some* such indication is required. The EPA does not meet even this minimal standard.

---

[3] *See Varner II*.

[4] *See EEOC v. Wyoming*, 460 U.S. 226, 243 n.18 (1983) (holding that to invoke its § 5 powers, Congress need not "anywhere recite the words 'section 5'' or 'Fourteenth Amendment' or 'equal (continued...)

---

[4] (...continued) protection'").

[5] *See also Chavez v. Arte Publico Press*, 204 F.3d 601, 604 (5th Cir. 2000) (acknowledging that *Florida Prepaid* has clarified Supreme Court precedent on this point).

### B.

The panel majority did not have the benefit of *Raygor v. Regents of the Univ. of Minn.*, 122 S. Ct. 999 (2002), when it issued its opinion. This new decision is further indication of the Supreme Court's increasing receptiveness to Eleventh Amendment arguments and reinforces my concerns about the panel majority's result and reasoning. *Raygor* holds, in an Eleventh Amendment sovereign immunity case, that "insofar as statutory intent was ambiguous, we [will] not 'attribute to Congress an intent to intrude on state governmental functions *regardless of whether Congress acted pursuant . . . to § 5 of the Fourteenth Amendment*.'" *Id.* at 1007 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991)) (emphasis added). In such cases, "it is not relevant whether Congress acted pursuant to § 5." *Id.* at 1007-08.

The specific context of *Raygor* was statutory ambiguity over whether Congress had intended to abrogate state sovereign immunity at all. The Court's reasoning, however, is also applicable to the question whether Congress sought to invoke section 5. This conclusion is required by *Raygor*'s emphatic statement that "[w]hen Congress intends to alter the usual balance between the States and the Federal Government, it must make its intention to so unmistakably clear in the language of the statute" to ensure that "the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision" of an important question of constitutional law. *Id.* at 1006 (citations omitted). Obviously, we cannot ensure that Congress faced the critical issue of the scope of its section 5 powers in the process of enacting the EPA if there is no indication that it sought to invoke those powers at all.

*Raygor* does not resolve the question of how strong an indication of congressional intent is required; but it certainly holds that at least *some* is necessary. Because the regulation of state employees by the Equal Pay Act undeniably "intrude[s] on state governmental functions" and "alter[s] the usual balance between the States and the Federal Government," *Raygor* strongly suggests that there must be at least minimal indication that Congress sought to invoke its powers under section 5. *Id.* at 1006, 1007.

### III.

Even if Congress did properly invoke its powers under section 5, the EPA fails the test of congruence and proportionality. "Congress can enact broad prophylactic legislation that prohibits conduct that is *constitutional* only when there is a 'congruence and proportionality between the injury to be remedied and the means adopted to that end.'" *Kazmier v. Widmann*, 225 F.3d 519, 524 (5th Cir. 2000) (quoting *Kimel*, 528 U.S. at 86). A statute cannot be justified under section 5 if it "prohibits substantially more state employment decisions and practices" than are themselves unconstitutional. *Kimel*, 528 U.S. at 86; *see also Kazmier*, 225 F.3d at 524 (same).

If the EPA is to be justified at all under section 5, it must be as a remedial measure aimed at eradicating unconstitutional sex discrimination. It is well established that the Equal Protection Clause forbids only intentional sex discrimination. *Personnel Adm'r v. Feeney*, 442 U.S. 256 (1979). Moreover, unconstitutional "[d]iscriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences . . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely

'in spite of,' its adverse effects on an identifiable group." *Id.* at 279 (quotation omitted).

Unfortunately, the EPA goes far beyond forbidding intentional sex discrimination. One circuit has described it as a "strict liability" statute under which "no intent to discriminate need be shown." *Fallon v. Illinois*, 882 F.2d 1206, 1213 (7th Cir. 1989). "Unlike the showing required under Title VII's disparate treatment theory, proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act." *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir. 1987).[6] Thus, there is a strong likelihood that the EPA "prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection . . . standard." *Kimel*, 528 U.S. at 86.

The four affirmative defenses to a *prima facie* case available under the EPA do not eliminate the danger that it can be used to prohibit an excessively large amount of constitutional conduct. Once the plaintiff establishes a *prima facie* case, these defenses

---

[6] In *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000), the Court relaxed somewhat the standards for disparate treatment liability under title VII, but it explicitly reaffirmed the fundamental principle that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 143 (internal citations omitted). Thus, a decision striking down the EPA as applied to the states does not imply that the application of title VII to state employers is constitutionally suspect. *See Fitzpatrick v. Blitzer*, 427 U.S. 445 (1976) (upholding the constitutionality of the 1972 amendments to title VII that extend it to state employers).

allow the defendant to justify the challenged earnings disparity if it is a result of "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; (4) any other factor other than sex." *Fallon*, 882 F.2d at 1211 (citing 29 U.S.C. § 206(d)(1) (1994)). Although these four categories (and particularly the catch-all last one) seem comprehensive, there are likely to be many cases in which none of them applies even in the absence of intentional, unconstitutional sex discrimination.

There may be numerous instances in which an employment decision was made as a result of difficult-to-articulate intuitive factors that cannot be affirmatively proven by evidence strong enough to refute a *prima facie* case under the EPA. In practice, the reasoning underlying an employment decision may be difficult or impossible to document at trial. Moreover, even where sex was the determining factor in a particular decision, it may not have been the result of "a . . . course of action [adopted] at least in part 'because of,' not merely 'in spite of,' its adverse effects on" women. *Feeney*, 442 U.S. at 279.

State agencies may adopt pay scales that have the effect of paying women less than men without doing so *"because of"* their "adverse effects" on women. *Id.* (emphasis added). The requirement that the defendant state affirmatively prove not only its lack of a discriminatory intent but also the existence of a valid alternative ground for its decision ensures that a substantial amount of constitutional state action will run afoul of the EPA.

Previous Supreme Court cases upholding a burden-shifting provision under section 5 have

done so only in cases in which the governmental entity had a long history of intentional discrimination, or where the specific challenged policy had a history of abuse as a pretext for discrimination.[7] By contrast, the EPA does not require any proof that the defendant has a history of intentional discrimination, nor does it limit its scope to employment practices that routinely have served as tools of intentional discrimination. It therefore falls short of the congruence and proportionality requirement the Supreme Court has imposed on section 5 legislation.

Our Eleventh Amendment jurisprudence in this area needs to be squared with recent and emerging Supreme Court law. Accordingly, I respectfully dissent from the denial of rehearing en banc.

---

[7] *See, e.g., City of Boerne*, 521 U.S. at 533 (surveying and summarizing these cases); *City of Rome v. U.S.*, 446 U.S. 156, 177 (1980) (upholding preclearance requirements imposed by the Voting Rights Act because they are limited to jurisdictions with a "demonstrable history of intentional racial discrimination"); *South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966) (upholding Voting Rights Act ban on voting tests "because of their long history as a tool for perpetrating evil").