### Ladonna HOCKMAN

v.

### WESTWARD COMMUNICATIONS, L.L.C., et al.

### No. 6:02–CV–510.

United States District Court,
E.D. Texas,
Tyler Division.

Sept. 18, 2003.

Alex Arthur Castetter, Stuckey Garrigan & Castetter, Nacogdoches, James Scott Howard, Flowers Davis LLP, Tyler, for Ladonna Hockman, plaintiff.

Felicity Anne Fowler, Haynes & Boone, Houston, Matthew Deffebach, Haynes & Boone, for Westward Communication, LLC, Westward Comm, LP, Westward General LLC, Oscar Rogers, defendants.

### ORDER

HANNAH, District Judge.

Before the Court are Defendants Westward Communications, L.L.C., Westward Communications, L.P., Westward General, L.L.C. (collectively referred to as "Westward"),[1] and Oscar Rogers' Motion for

---

1. Plaintiff has sued Westward Communications, L.L.C., Westward Communications, L.P., Westward General, L.L.C. and Oscar Rogers. According to Defendants, Westward Communications, L.L.C. converted to Westward Communications, L.P. on September 30, 2001, just before Plaintiff made her first complaint. Thus, she was employed by both these entities. The other named Defendant, Westward General, L.L.C., is a general partner to the L.P., and Plaintiff never worked for this entity. This was pointed out by Defendants and never addressed by Plaintiff. Accordingly, the claims against Westward General, L.L.C. should be dismissed.

Summary Judgment and Brief in Support (Doc. # 32), Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. # 41), and Defendants' Reply (Doc. # 44). Based on the parties' filings and the applicable law, the Court rules as follows.

## I. BACKGROUND

Plaintiff LaDonna Hockman first worked for Defendant Westward, a newspaper group, from approximately March, 1998, through June 30, 1999, as an Assistant Editor at the *Edgewood Enterprise*. The reasons for her first departure are unclear, with Plaintiff citing a personality clash with a former publisher, and Defendants citing her involvement in a theft. Nonetheless, her personnel file lacked any notation regarding her separation, and she was hired again in 2001 by a new publisher, Nell French, for the Editor position for the *Grand Saline Sun*. The rehire occurred on or about April, 2001, and on July 24, 2001, Plaintiff acknowledged by signature her receipt and understanding of the Employee Handbook, which contained Defendants' anti-harassment policy.

On or about October 11, 2001, Plaintiff Hockman and a co-worker, Molly Harvill, approached their supervisor, Nell French, complaining that another co-worker, Oscar Rogers, had been sexually harassing them. Plaintiff claimed that, beginning at the

time of her rehire, Rogers made comments about a former employee's "nice shape." She claimed that those particular comments stopped, but that Rogers had become more aggressive since July of that same year. She complained that, in that time period, Rogers brushed up against her numerous times, though she admits that the conduct appeared to be accidental and ended "as quickly as it started," once popped her on the rear with a rolled up newspaper, once grabbed her face and tried to kiss her and allegedly brushed up or attempted to grab her breast at the same time,[2] and made comments about coming in early so they could be alone. Plaintiff claimed she was too humiliated and embarrassed to come forward before she did.

The facts are disputed as to what happened following the initial disclosure to French on October 11, 2001. Plaintiff claims that French did nothing, despite her several attempts to get French to do "whatever procedure she was supposed to do." Plaintiff claims she had no idea what, if anything, French was doing, that Plaintiff asked her several times what she was doing, and that the inappropriate touching and harassment continued as before. Specifically, Plaintiff claims that, in November, 2001, Rogers trapped her in the bathroom by standing in the doorway.[3] This was the last act of sexual harassment that

---

**2.** After being pointedly asked, in a deposition taken April 30, 2003, if Rogers had grabbed her breasts, Plaintiff testified that he had only "grabbed" her breast once, during the incident where he tried to kiss her. She even admitted that it might have been an a "brushing," if he even "grabbed" at all. In seeming contradiction, in her affidavit of July 9, 2003, Plaintiff testified that Rogers had grabbed her breasts *numerous* times. Again, in her deposition, she testified that any alleged harassment stopped with the "bathroom incident" in November, 2001. Her affidavit and motion for summary judgment, however, state that Defendant Rogers touched Plaintiff's breasts

and buttocks on *numerous* occasions both before *and after* she reported him on October 11, 2000[sic].

**3.** Hockman's deposition revealed that she was washing her hands in the bathroom, with the door open, and when she turned around Roger was blocking the doorway. When Hockman moved towards Rogers, she testified that he moved out of the way and let her pass, and she did not have any words or physical contact with him; nonetheless, Plaintiff claims she felt "threatened" and "feared for her safety."

Plaintiff complains of, though it involved no comments or touching.

Plaintiff claims that she told French about this incident and that, again, nothing was done. Plaintiff did not pursue her complaint beyond telling French. Plaintiff claims that French referred her to an anti-harassment policy hanging above the copier, which actually belong to the newspaper's predecessor company. This manual directed those with complaints to their supervisor or a regional vice-president. Complainants were instructed to make their complaints to the corporate office if unsatisfied at the local level. Plaintiff claims, however, that she thought she could not talk to anyone besides French because she had been told before, in an unrelated incident, to· "never go over French's head."

French, however, claims that Plaintiff and Harvin refused to lodge a formal complaint in writing against Rogers and instead asked French to first talk to another employee, Aggie McDonald, who would corroborate their claims. French claims that she did talk to McDonald, that she denied that Rogers had acted inappropriately and that she refused "to go along with" the claims by Plaintiff and Harvill. Both French and McDonald have submitted affidavits to this effect. In the course of her investigation, French also talked to several other employees, to determine if they knew of or had received any complaints regarding Rogers. Her investigation did not reveal any further complaints about Rogers by any other employees, and she determined that the evidence was inconclusive. She claims she did not talk to Rogers directly because Plaintiffs continued to hesitate to make a formal complaint and did not want Rogers to know they had complained. After asking Plaintiff several times and seeing Plaintiff's reticence to make a formal complaint against Rogers, coupled with the results of her investiga-

tion, French concluded that the allegations by Plaintiff lacked merit—so that no prompt and remedial measures were required.

On February 19, 2002, Defendants received a draft of Plaintiff's intended Charge of Discrimination from Plaintiff's attorney. Upon receipt of this information, Westward's Human Resources Director, Gina Fisher, immediately launched an investigation. She contacted French, who explained to Fisher that Plaintiff did not want to pursue a formal complaint against Rogers following the October 11, 2001 report that Rogers had allegedly attempted to kiss her. Fisher also contacted Rogers and interviewed him about the matter. Rogers became visibly upset and denied the allegations, offering to take a lie detector test or have a background or security check performed on him to clear his name. When Fisher contacted Plaintiff on February 20, 2002, regarding her allegations, Plaintiff would not discuss them with Fisher. Defendants allowed Hockman a day off work so that she could go to her attorney's office and speak with the company on the phone there.

On February 22, 2002, Fisher interviewed Plaintiff from her attorney's office. Hockman claimed that Rogers had attempted to hug and kiss her in September 2001, and, sometime in between October and December 2001, Rogers "threatened" her by blocking the exit to the ladies' restroom. Notably, Hockman did not mention any slaps on the buttocks, or grabbing of her breasts by Rogers in relaying her complaints to Fisher. Fisher inquired as to why· Hockman never contacted her after the October 2001 "complaint" to French, and Hockman claimed that she did not proceed further with her claims because she said she felt she was not allowed to "go over French's head." She also detailed her sex discrimination

charges, i.e., disparity in pay and mileage reimbursements, to Fisher.

Fisher then conducted her own investigation into the allegations by Plaintiff. While Fisher was conducting her investigation, she and other Westward executives made the decision to separate Rogers from both Hockman and Harvill. On February 27, 2002, French provided Rogers with a memorandum forbidding him from contact with Harvill until the investigation was completed. He was instructed to keep his door shut during working hours, enter only through the back door and to have no communication or direct contact with the complainants. Moreover, because of the pending harassment allegations, the company decided to transfer Hockman to the *Edgewood Enterprise,* approximately 12 to 15 miles away. Plaintiff accepted the transfer, though she expressly indicated on her Transfer Notice that she would rather stay at the Grand Saline office and that she felt the transfer was an act of retaliation.

On the same day that Hockman accepted the transfer to the Edgewood office, February 27, 2002, she filed a claim with the EEOC, alleging sexual harassment by Rogers, sex discrimination based on her pay and mileage reimbursement, and retaliation when Westward transferred her to the *Edgewood Enterprise.*

Fisher continued her investigation into Plaintiff's claims during this period. As part of her investigation, Fisher interviewed several employees, past and present, regarding their interactions with Roger and found no credible evidence of sexual harassment on the part of Rogers. Again, Aggie McDonald was contacted, and McDonald maintained that she had not been harassed by Rogers nor had she witnessed any harassment by Rogers towards any other person. However, McDonald told Fisher that she had heard Hockman made statements about Rogers referring to him as a "nigger" and claiming that "his job would be gone by next Friday." McDonald explained that Rogers had served as foreman on a grand jury that had "no-billed" Hockman's husband's ex-wife on trespassing charges, and Hockman was "out to get him" for not indicting her.

On March 13, 2002, Fisher concluded her investigation and found the evidence against Rogers to be inconclusive. Nevertheless, Fisher warned Rogers that any sexually inappropriate activity in the workplace was strictly prohibited, cautioned him against even friendly physical contact in the form of hugs, arms around the shoulder, pats, etc., and had him re-read and sign the anti-harassment policy.

On March 14, 2002, Fisher contacted Hockman and informed her of the inconclusive results of her investigation. She also, at this time, related to Hockman what McDonald had said regarding the racial slurs made by Hockman, that these allegations had also been inconclusive, but issued a warning to Hockman not to engage in racially inappropriate behavior in the workplace. She also had Hockman read again and sign an acknowledgment of the anti-harassment policy. Plaintiff claims this investigation constituted further harassment of her because of the EEOC charge.

On April 4, 2002, Plaintiff resigned for health reasons and cited the hostile work environment as the cause. She admitted that any sexual harassment had ended at least several months prior to her resignation, but alleged that the "retaliation, i.e, daily accusations levied against me, has increased the stress to an unbearable level." Plaintiff subsequently commenced this employment discrimination lawsuit against Defendants, alleging she was sexually harassed in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* More specifically, Plain-

tiff alleges she was subjected to a sexually harassing hostile work environment in violation of Title VII. Plaintiff also brings a cause of action for retaliation for the exercise of her legal rights, asserts constructive discharge, alleges sex discrimination for disparity in pay, and asserts supplemental state law claims against co-worker Oscar Rogers for assault, battery and intentional infliction of emotional distress.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). A fact is "material" if it might affect the outcome of the suit under the governing law. *Merritt–Campbell, Inc. v. RxP Prods., Inc.,* 164 F.3d 957, 961 (5th Cir.1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Merritt–Campbell, Inc.,* 164 F.3d at 961. When ruling on a motion for summary judgment, the Court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Merritt–Campbell, Inc.,* 164 F.3d at 961.

The party seeking summary judgment bears the initial burden of demonstrating the lack of a genuine issue of material fact. *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). If the moving party "fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.* If the movant meets its burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *EEOC v. Texas Instruments Inc.,* 100 F.3d 1173, 1180 (5th Cir.1996); *Wallace v. Texas Tech. Univ.,* 80 F.3d 1042, 1046–47 (5th Cir.1996). The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Matsushita,* 475 U.S. at 585, 106 S.Ct. 1348; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075.

## III. DISCUSSION

### A. CO–WORKER SEXUAL HARASSMENT

#### 1. *Prima facie* case

Under Title VII of the Civil Rights Act of 1964, "it shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of … sex." 42 U.S.C. § 2000e–2(a)(1) (2001). Under Fifth Circuit precedent, to establish her *prima facie* case for co-worker sexual harassment, Plaintiff must prove (i) she belongs to a protected group; (ii) she was subjected to unwelcome harassment; (iii) the harassment was based on sex; (iv) the harassment affected a "term, condition or privilege of the employment;" and (v) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Jones v. Flagship Int'l,* 793 F.2d 714, 719–20 (5th

Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Defendants challenge the last two elements of Plaintiff's *prima facie* case of harassment.

■ Taking Plaintiff's allegations as true, the first issue then is whether Rogers' alleged harassment was so severe and pervasive that it altered the terms and conditions of her employment. Plaintiff, at this juncture, must present evidence of an objectively and subjectively abusive work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). To determine whether a harassment plaintiff has established the existence of an objectively hostile environment, courts review "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. at 367.

a. Was the conduct so severe and pervasive so as to alter the terms and conditions of employment?

The courts have rejected hostile work environment claims as a matter of law premised upon facts more egregious than Plaintiff has alleged here. *See, e.g., Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 873 (5th Cir.), *cert. denied*, 528 U.S. 963, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999) (finding that several inappropriate comments, including "your elbows are the same color as your nipples," and touchings, including rubbing his hands down her arm from her shoulder to her wrist, which occurred over the course of two years, were "boorish and offensive" but were not objectively severe or pervasive enough to constitute actionable sexual harassment); *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir.1993) (finding that conduct that included attempting to kiss plaintiff once at bar and twice at work, several incidents of unwanted touching, placing "I love you" signs in her work area and asking her out on dates were not sufficient for actionable harassment); *Jones v. Seago Manor Nursing Home*, 2002 WL 31051027, at *1, 4 (N.D.Tex. Sept.11, 2002) (stating that plaintiff's summary judgment evidence fell short of the type of extreme conduct necessary to establish a hostile work environment when plaintiff alleged that her supervisor: (i) told her, "You know, if I stick [my penis] in you, you'll say computer right"; (ii) said to her "Ooh, girl, I could stick this long [expletive deleted] in you and you … go tell your husband that you'll leave him for a white man; (iii) touched plaintiff's buttocks and remarked that '[it] must be jelly because jam [does not] shake like that'; and (iv) grabbed his crotch and looked at her)."

Like the cases above, Rogers' actions, taken as true for summary judgment purposes, are no doubt boorish and offensive, but the question remains whether they rise to the severe and pervasive level required for an actionable claim. Rogers' alleged comments regarding the former employee's shape and requesting Hockman to come in early certainly do not warrant a finding of severe and pervasive as a matter of law. The brushings, the "butt whack," and the one attempted kiss (and attendant grab of Plaintiff's breast) may be boorish and offensive, but they do not rise to the level of the more egregious facts elucidated in the cases above. Moreover, despite Plaintiff's allegations of a hostile work environment, when the company attempted to transfer her to another location, she responded in writing that she would rather stay in the Grand Saline office, where the alleged harassment occurred. The very fact that she desired to continue in the very workplace that she complained was intolerable, undermines any claim that Rogers' actions were so severe and perva-

sive so as to constitute an abusive work environment. However, assuming *arguendo* that Plaintiff were to prevail on this part of the element, that the actions of Rogers were subjectively and objectively severe and pervasive so as to create a hostile work environment, the analysis is not complete.

■ Even when a hostile environment is shown, the plaintiff must establish that the workplace environment had the effect of altering the terms and conditions of her employment. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. The bottom line is that the conduct must be so severe or pervasive as to undermine the plaintiff's workplace competence. *See Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263, 270 (5th Cir.1998) (holding that, in addition to other factors, a "plaintiff must show that implicit or explicit in the sexual content is the message that the plaintiff is incompetent because of her sex."). *See also Pfeil v. Intecom Telecomm.,* 90 F.Supp.2d 742, 749 (N.D.Tex. 2000) (stating that equality, the overall goal of Title VII, "is not served if a claim can be maintained solely based on conduct that wounds or offends, but does not hinder an employee's performance"). Nowhere does Plaintiff provide this evidence. To the contrary, the evidence shows that Plaintiff competently discharged her duties even during the time of the alleged harassment. Accordingly, the Court finds that Plaintiff fails to meet her burden on this element as a matter of law. Though Plaintiff's claim ultimately fails based on her inability to make her *prima facie* case on the above element, the Court addresses the last element challenged by Defendant as well.

### 2. Prompt Remedial Action

■ In Title VII sexual harassment cases where the alleged harasser is a supervisor, an employer may assert the following affirmative defense: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

This is not a supervisor liability case. However, the second prong of the affirmative defense is instructive to our "co-worker" liability case. In *Woods v. Delta Beverage Group, Inc.,* 274 F.3d 295, 300 n. 3 (5th Cir.2001), the Fifth Circuit concluded that, as in a supervisory harassment case, the plaintiff's unreasonable failure to take advantage of the company's corrective opportunities was instructive in a co-worker harassment suit. To satisfy the fifth element of her *prima facie* case, Hockman needs to show that she reasonably took advantage of the corrective opportunities provided by her employer. *Id.*

■ The summary judgment evidence shows that Plaintiff chose not to report Rogers when the alleged harassment began. Plaintiff claimed that Rogers began making comments about another female's figure soon after she began work, in April, 2001. Though she claimed the comments were offensive to her, there is no record of her reporting them to Defendant. It is undisputed that Plaintiff received the Employee Handbook, which included the company's anti-harassment policy. It is further undisputed that, on July 24, 2001, Plaintiff acknowledged by her signature her receipt of the handbook and her understanding of its provisions. However, despite her awareness, there is no evidence that Plaintiff availed herself of any of the company's provisions at this time, several months after the alleged harassment began.

The summary judgment evidence further reflects that Rogers' behavior became more aggressive sometime in July. Still, Plaintiff did not complain. It was not until several more months that Plaintiff finally disclosed to French her complaints about Rogers. Even then, though the parties dispute why, when the matter was not handled satisfactorily to Plaintiff, she let the matter "sit" for another four months and chose not to report to a higher authority in the company as required by the company policy.

Based on these facts, Defendants assert in their motion that Plaintiff does not meet the last element of her *prima facie* case because she unreasonably failed to take further action if French, in fact, failed to take corrective action. Here, the issue, assuming that (i) Hockman did file a complaint with French on October 11, 2001, and (ii) French failed to take action, is whether it was unreasonable for Hockman not to pursue her complaint through the Company's by-pass procedure, i.e., Gina Fisher, when the policy required Hockman to take the complaint to Fisher if unsatisfied at the supervisory level. Though by Plaintiff's account, she had been directed by French to an outdated harassment policy of another company, Defendants submit evidence, and Plaintiff does not deny, that she read Westward's anti-harassment policy and even signed the Employee Handbook acknowledging that fact. Moreover, when displeased with French's approach, Plaintiff did nothing for several months and elected not to notify Fisher. Instead, Hockman secured an attorney and allowed the attorney to contact the very person she was directed by the Employee Book to contact.[4] Whether she subjectively felt she could not "go over French's head" is immaterial to the fact that the policy she

acknowledged directed to her to do just that.

It is undisputed that once Fisher did hear of the complaints, through Plaintiff's attorney, that Westward responded promptly and investigated Plaintiff's claims. The summary judgment evidence shows that, on February 19, 2002, Fisher received from Plaintiff's attorney a draft of Plaintiff's EEOC charge. The evidence shows that Fisher immediately began an investigation, which culminated in the separation of Plaintiff from Rogers within eight (8) days, on February 27, 2002. Plaintiff concedes that no harassment occurred following the receipt of the letter from her attorney.

Where measures abate harassment, they are prompt and remedial as a matter of law and prevent a party from raising an issue of material fact on her co-worker sexual harassment claim. *See Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 616 (5th Cir.1999). Accordingly, the Court finds that Plaintiff unreasonably failed to take advantage of the company's corrective opportunities afforded her above the supervisory level. Further, the Court finds that once Fisher learned of Plaintiff's complaints, Defendants exercised reasonable care and acted promptly to correct any sexual harassment. As Plaintiff has failed to prevail on this element as well, the Court finds that Plaintiff fails to establish her *prima facie* case of hostile work environment sexual harassment as a matter of law.

## B. RETALIATION

 Plaintiff has also asserted a claim of retaliation against Defendants for the exercise of her legal rights. As such, Plaintiff has the burden to prove a *prima*

---

4. Though Plaintiff claims she could not "go over French's head," copies of this letter were sent, not to French, but to higher executives in the Defendant company, including Gina Fisher.

*facie* case of Title VII retaliation. To do so, she must produce sufficient evidence to support a finding on three elements: (i) she engaged in an activity protected by Title VII; (ii) Westward carried out an adverse employment action; and (iii) a causal nexus exists between her protected activity and Westward's adverse action. *Chaney v. New Orleans Pub. Facility Mgmt., Inc.,* 179 F.3d 164, 167 (5th Cir. 1999), *cert. denied,* 529 U.S. 1027, 120 S.Ct. 1439, 146 L.Ed.2d 327 (2000). The establishment of a prima facie case gives rise to an inference of retaliation. *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 407–08 (5th Cir.1999), citing *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 41 (5th Cir.1992). If Hockman succeeds in proving a *prima facie* case, then Westward must articulate some legitimate, nonretaliatory reason for its adverse employment action. *See, e.g., Reeves v. Sanderson Plumbing Prod.,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). If Westward satisfies this burden of production, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reason offered by the defendant was but a pretext for discrimination. *Id.* at 147–48, 120 S.Ct. at 2106. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Id.* A party's subjective belief that she was discriminated or retaliated against is insufficient to preclude summary judgment. *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 427 (5th Cir.2000).

The *Reeves* decision made it *permissible* for the trier to infer the ultimate fact of discrimination from the falsity of the employer's explanation. *Reeves,* 530 U.S. at 147–48, 120 S.Ct. at 2108. Specifically, the *Reeves* Court opined, "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Id.*

However, the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff. *Id.* As the *Reeves* Court instructed, "[T]he ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct.'" In other words, "[i]t is not enough ... to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. *Id.* "[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination". *Id.*

### 1. Transfer to the *Edgewood Enterprise*

In furtherance of her retaliation claim, Plaintiff alleges that the Edgewood working conditions were intolerable: she had to clean up spiders, spider webs, dead crickets, maggot-infested dead rats, old newspapers, urine and feces on the bathroom walls and fixtures, and, incredibly, semen from the top of a desk. She claimed that it took her two weeks and 40 trash bags to make the place tolerable. To her, this was clearly punishment for filing her charge.

■ Defendants claim that the offer of the Editor position at Edgewood was

strictly a lateral move. In this circuit, a lateral transfer does not constitute an adverse employment action under Title VII. *Burger v. Central Apt. Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir.1999). The summary judgment evidence shows that Plaintiff maintained the same duties, with the exception in her favor that she no longer had to cover the sports as other editors were required to do. She maintained the same pay, and same benefits, and she was reimbursed for her mileage to Edgewood, even though Plaintiff already drove to Edgewood twice a day to drop off and pick up her children from school, as they attended school in Edgewood. Regarding the filthy conditions, Defendants point to the fact that the place was cleaned up within a week or two and argue that this short and temporary condition did not change her purely lateral transfer into an adverse employment action. *See Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1420–21 (8th Cir.1995) (noting that temporary poor conditions were not sufficient evidence of a transfer to equate with an adverse employment action).

■■■ Defendants cite two legitimate, non-retaliatory reasons for the transfer, the first and most obvious being the separate her from the alleged harasser, Oscar Rogers. Further, Defendants provide evidence in the form of affidavits from their executives showing that Westward was experiencing poor financial performance by both the *Grand Saline Sun* and the *Edgewood Enterprise*, and that French was spread too thin as Publisher over three papers (the two aforementioned plus the *Wood County Democrat* ). As part of a reorganization plan, Westward decided to eliminate the Editor position of the *Grand Saline Sun*, Plaintiff's position, and instead create an Assistant Publisher position to manage the business and editing duties of both the *Grand Saline Sun* and *Edgewood Enterprise.*

Defendants provide additional evidence that, on or about December 28, 2001, after Plaintiff's complaint of Rogers to French, Plaintiff was found to be in possession of a sealed court document that had been given to her by a local policeman. Hockman had signed an affidavit with the local police regarding the incident in which she revealed the source of where she obtained her file. Fisher drafted a termination corrective action form, but after meeting with French and a Westward VP, Graham, decided not to terminate Hockman. Instead, French met with Hockman and counseled her not to engage in future conduct that could affect Westward negatively. Hockman received a written warning for her behavior, but was allegedly told by French that this would not have any negative impact on her job.

Based on Hockman's lack of business experience and her recent performance problems regarding the police confidential file, Graham concluded Hockman was not qualified for the Assistant Publisher position. On February 7, 2002, the job was offered to Wilbur Callaway. The company concluded that transferring Hockman to Edgewood not only kept Rogers away from Hockman, but allowed Hockman to keep her job despite the business reorganization.

Plaintiff discounts Defendant's articulated legitimate, nondiscriminatory reason and argues that only retaliation could have prevented her from getting this position, especially after French told her that her written warning would not have any adverse affect on her. Such speculation is not admissible summary judgment evidence and does not supply the necessary pretext in order to survive summary judgment or compel judgment in Plaintiff's favor.

### 2. Unfavorable treatment

■ Hockman further contends that Defendants retaliated against her based on the following unfavorable treatment: (i) being placed under the supervision of her replacement at the *Grand Saline Sun*;[5] (ii) hostility from co-workers and supervisors; (iii) a "baseless racial harassment" investigation;[6] (iv) a "directive not to be sick on Tuesdays;" and (v) changes in requirements regarding her doctors' excuses.

Even in the light most favorable to Hockman, these allegations of unfavorable treatment cannot, as a matter of law, constitute "adverse employment actions," a necessary element of the retaliation *prima facie* case. Under Title VII, adverse employment actions include only "ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Green v. Administrators of the Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir.2002). *See, e.g., Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.1997) (finding that hostility from fellow employees was not adverse employment action). Accordingly, Plaintiffs unfavorable treatment allegations are insufficient, as a matter of law, to raise a fact issue as to Plaintiff's retaliation claims.

### 3. Discouraging prospective employers

■ Finally, Plaintiff claims that Defendants retaliated against her by providing unfavorable references to prospective employers. However, she only applied at one computer company, when earlier she conceded she had no computer expertise, and does not produce any admissible evidence that Westward communicated with any prospective employer other than her speculation that Westward "must have" communicated with these employers because she did not get hired.[7] Such speculation is not competent summary judgment evidence and warrants the dismissal of this claim as well as a matter of law. *See Forsyth*, 19 F.3d at 1533.

## C. CONSTRUCTIVE DISCHARGE

### 1. Requirement of Existence of Aggravating Factors

■ To prove constructive discharge, Hockman must establish that the working conditions at Westward "were so intolerable that a reasonable employee in her position would [have felt] compelled to resign." *Webb v. Cardiothoracic Surgery Assoc. of N. Tex.*, 139 F.3d 532, 539 (5th Cir.1998). Allegations of harassment alone are insufficient to constitute constructive discharge. *See, e.g., Taylor v. Texas Dep't. of Crim. Justice—Inst. Div.*, 2000 WL 528410, at *6 (N.D.Tex. May 1, 2000) (finding that harassment allegations alone did not support constructive discharge claim). In order to show constructive discharge in a sexual harassment case, Hockman must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment. Namely, the Fifth Circuit requires the presence of "aggravating factors" to justify a departure from the employer: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrad-

---

**5.** It is undisputed that Hockman was an Editor and that her "replacement," Wilbur Callaway, was hired as an Assistant Publisher.

**6.** When Defendants investigated Plaintiff's claims, it was discovered from co-worker McDonald that Hockman had allegedly used the word "nigger" to describe Rogers. Fisher investigated and found these allegations to be inconclusive, but not "baseless." Westward did not take any adverse employment action against Hockman as a result of this investigation.

**7.** Further, Plaintiff abandoned this claim by not addressing it in her Response to Defendants' Motion for Summary Judgment.

ing work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not. *Barrow v. New Orleans Steamship Ass'n,* 10 F.3d 292, 297 (5th Cir.1994). Plaintiff relies solely on the fifth factor stating that her resignation stemmed from the "sexual advances" of Rogers and "retaliation" from Westward's employees. As evidenced by the language in her resignation letter, Hockman's motivation for quitting her employment was the health reasons allegedly caused by the conflicts and unpleasant relationships she had with her co-workers, i.e., their retaliation against her. Claims based on the "sexual advances" of Rogers, without more, fail to raise a triable fact issue.

### 2. Prompt remedial measures

Moreover, an employer's prompt and remedial measures are fatal to a constructive discharge claim. *See Webb,* 139 F.3d at 539–40. Likewise, failing to provide the company with a sufficient opportunity to correct the alleged harassment dooms a constructive discharge claim. *See Landgraf v. USI Film Prod.,* 968 F.2d 427, 430–31(5th Cir.1992) (stating that "a reasonable employee would not have felt compelled to resign immediately following the institution of measures ... reasonably calculated to stop the harassment.").

It is undisputed that when Fisher was contacted by Hockman's attorney, she immediately began an investigation, warned Rogers to have no contact with Hockman or Harvill during the investigation, and physically separated Hockman from Rogers. Hockman resigned a mere four weeks later. Plaintiff testified by affidavit

that there was no harassment following the attorney's letter to Defendants.

Additionally, Defendants argue that a reasonable employee would not have felt compelled to resign immediately following the institution of measures which the district court found to be reasonably calculated to stop the harassment. *See Dornhecker v. Malibu Grand Prix Corp.,* 828 F.2d 307, 309–10 (5th Cir.1987) (reversing judgment for the plaintiff where the employer took decisive action but the plaintiff quit her job too soon for the remedy to have effect). Defendants provide further context to Plaintiff's resignation and argue that Plaintiff's quick departure destroys her constructive discharge claim. Defendants submit evidence that, as part of Hockman's Editor duties, she was responsible for "paste up" days, which occurred on Tuesdays of each week. This was performed at the *Wood County Democrat* office in Quitman, Texas because of its better printing equipment. Defendants produce evidence that Hockman began to be absent on Tuesdays, and when, on April 2, 2002, she missed three consecutive work days, including two consecutive paste-up days, for doctor visits (though she was seen at a shopping center by another employee), she was issued a written warning that her absences were inexcusable. Plaintiff quit two days after she was reprimanded for missing work.[8]

The Court agrees that Defendant instituted prompt remedial measures that reasonably calculated to end all harassment. Plaintiff's departure after a mere four weeks after separation from the alleged harasser, when Plaintiff concedes she did not suffer any more harassment, belies her constructive discharge claim based on sex-

---

**8.** Interestingly, Molly Harvill also terminated her employment for medical reasons on or

near the same date as Plaintiff.

ual harassment. Thus, Plaintiff's claims fail as a matter of law.

### 3. Retaliation

█ Regarding Plaintiff's constructive discharge claims based on retaliation, Plaintiff claims in her Response that Harvill heard the new assistant publisher, Wilbur Callaway, make a statement that he would get a bonus for "running off" Harvill and provides Harvill's affidavit in support. Hockman presumes that because Callaway made a statement about Harvill, it applied to her as well. She does not provide any other evidence to support her supposition. Such speculation is not competent summary judgment evidence. *See Forsyth,* 19 F.3d at 1533. As such, Plaintiff's constructive discharge claims, without more, do not raise a triable fact issue and fail as a matter of law.

## D. SEX DISCRIMINATION

To prove a Title VII *prima facie* sex discrimination claim, Hockman must prove: (1) she was a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, (4) and other similarly situated employees were treated more favorably than her. The burdens of proof for a sex discrimination claim are the same as for a retaliation claim. *See Rutherford v. Harris County,* 197 F.3d 173, 180 (5th Cir.1999).

Plaintiff bases her sex discrimination claims on two allegations: (i) that two male editors, specifically, Scott Mullen, the Assistant Editor at the *Edgewood Enterprise,* and Al Rowe, the Editor she replaced at the *Grand Saline Sun,* made more money that she did, and (ii) some unknown person told Hockman that Rowe used to get reimbursed for mileage from his home to work at the *Grand Saline Sun.* She provides no evidence to support her claims other than her affidavit which testifies only to her conclusory beliefs.

Plaintiff's mileage claim is supported only by inadmissible hearsay, a comment made by someone unknown to her, which cannot be used to create a fact issue. Additionally, the summary judgment conclusively establishes that Hockman was reimbursed for her work mileage and, following her transfer to the *Edgewood Enterprise,* she was reimbursed for mileage from home to work.

█ Even if Plaintiff were to establish a *prima facie* case regarding her disparate pay claim, Defendants articulate a legitimate nondiscriminatory reason for the disparity in pay and produce spreadsheets that show that Plaintiff was paid more than most editors and, of the ones who did receive more pay (five of eleven), three were female and all five had a longer tenure with the company. The Fifth Circuit recently affirmed that an employer can compensate employees differently based on a seniority system or length of service. *See Siler–Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio,* 261 F.3d 542, 546 (5th Cir.2001) (noting that affirmative defenses of Equal Pay Act have been incorporated into Title VII claims).

Moreover, the employees specifically complained of by Hockman were not similarly situated to her. For Hockman to demonstrate that Westward's tenure-based pay structure is a pretext for discrimination, she must establish her *prima facie* burden of demonstrating that the comparators, Rowe and Mullen, were similarly situated, i.e., in "nearly identical circumstances." *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.,* 245 F.3d 507, 514 (5th Cir.2001). The "nearly identical" standard, when applied at the *McDonnell Douglas* pretext stage is a stringent standard—employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not con-

**528**

sidered to be "nearly identical." *Id.* at 514–15. Al Rowe was not employed at the same time as Hockman, and Scott Mullen was an Assistant Editor, not an Editor as was Hockman, and only made $8.50 an hour compared to Plaintiff's $10.00 an hour salary. Because her "similarly situated" comparators are not "nearly identical" to her, Hockman cannot establish pretext for discrimination on this basis, and Plaintiff's sex discrimination claims fail as a matter of law.

## IV. CONCLUSION

After careful review and consideration, and for the above reasons, the Court finds that Defendant Westward's Motion for Summary Judgment should be granted in all things. In light of the Court's dismissal of all federal claims against Defendant Westward, the Court respectfully declines to exercise supplemental jurisdiction, under 28 U.S.C. § 1367, over Plaintiff's state-law claims against Oscar Rogers.

It is therefore, ORDERED that Defendant Westward's Motion for Summary Judgment regarding Plaintiff's claims for sexual harassment, retaliation, constructive discharge, and sex discrimination under Title VII of the Civil Rights Act of 1964 be, and hereby is, in all things GRANTED.