**EQUAL EMPLOYMENT,
OPPORTUNITY COMMISSION,
Plaintiff,**

v.

**TXI OPERATIONS, L.P., Defendant.**

No. 3:03–CV–1868–P.

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 13, 2005.

Ronetta J. Francis, Robert A. Canino, Jr., Suzanne M. Anderson, Equal Employment Opportunity Commission Dallas District Office, Dallas, TX, for Plaintiff.

Ronald E. Manthey, Ellen L. Perlioni, Baker & McKenzie–Dallas, Dallas, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Now before the Court is Defendant TXI Operations, L.P.'s ("TXI" or "Defendant") Motion for Summary Judgment ("Def.'s Br."), filed September 7, 2004. Plaintiff Equal Employment Opportunity Commission ("EEOC") filed its Response ("Pl.'s Resp.") on October 13, 2004, and Defendant filed its Reply ("Def.'s Reply") on October 27, 2004. After considering the parties' arguments and briefing, and the applicable law, the Court GRANTS Defendant's Motion for Summary Judgment.

### I. Background and Procedural History

On August 19, 2003, "Plaintiff Equal Employment Opportunity Commission ("EEOC" [or "Plaintiff"]) brought this lawsuit on behalf of Charging Party Julie Fundling ('Fundling') against [TXI] alleging (1) Equal Pay Act and (2) Title VII sex discrimination relating to her salary." Def.'s Mot. for Summ. J. ("Def.'s Mot.") at p. 1. Fundling asserts "her salary was discriminatory as compared to that of Wes Schlenker ('Schlenker'), a male employee. Fundling and Schlenker were both attorneys in TXI's legal department reporting to Robert Moore ("Moore"), TXI's Vice President, General Counsel and Secretary."

In November 1991, Moore hired Fundling to work in Defendant's legal department (the "legal department").[1] See Fundling dep. at p. 37, l. 25 to p. 38, l. 19 (Def.'s App. at pp. 146–47); Moore decl. at ¶ 2 (Def.'s App. at p. 103); Def.'s Offer of Employment (Pl.'s App. at p. 10). Fundling began with a starting annual salary of $57,500 as a Grade 13 employee, see Moore decl. at ¶ 9 (Def.'s App. at p. 104), and reported directly to Moore in her new position. Def.'s Offer of Employment (Pl.'s App. at p. 10). At the time of her hire, only Moore and Fundling worked in the legal department. Fundling dep. at p. 38, ll. 4–8 (Def.'s App. at p. 147). Previous to her employment with Defendant, Fundling worked as an associate with the law firm of Johnson & Gibbs, P.C. from approximately April 1990 to October 1991.[2] Moore decl. Ex. 2 (Def.'s App. at pp. 121–24).

At the time of her hire, TXI assigned Fundling a substantial amount of real estate matters in addition to her other duties. See Moore decl. at ¶¶ 4, 11–12 (Def.'s App. at pp. 103, 105). Unfortunately, Fundling had no experience in the area of real estate law. See Fundling Resume (Pl.'s App. at pp. 5–6). Indeed, from approximately 1992 to 1993, Fundling received three separate complaints regarding her work on real estate matters. Bone dep. at p. 27, l. 3 to p. 31, l. 2 (Def.'s App. at pp. 76–77). After the third complaint, Barry M. Bone ("Bone"), TXI's Real Estate Vice President, "informed [Moore] that the Real Estate Department would not use Fundling for any of their legal work going forward." Moore decl. at ¶ 14 (Def.'s App. at p. 105); Bone dep. at p. 31, ll. 3–12 (Def.'s App. at p. 77). As a

---

**1.** Apparently, Fundling married sometime between November 1991 and 1994. *Compare* Moore decl. Ex. 2 ("Employment Application") (Def.'s App. at pp. 121–24) (showing Fundling's last name to be Henderson and listing her emergency contact as "Mr. Scott Fundling," her "boyfriend") *with* August 12, 1994, Performance Evaluation (Pl.'s App. at pp. 15–23) (showing Fundling's last name to be Fundling); *see also* Moore dep. at p. 63, ll. 8–11 (Pl.'s App. at p. 89).

**2.** "While at Johnson & Gibbs, [] Fundling practiced general corporate law, and performed work dealing with bankruptcy, securities, contracts and filing." Pl.'s Resp. at p. 2 (citing Pl.'s App. at pp. 1–4 ("Fundling's TXI Employment Application")).

result, Moore "authorized the Real Estate Department to take all of their legal work, with the exception of litigation relating to real estate matters and certain administrative matters relating to corporate governance and board resolutions, to outside counsel to handle." Moore decl. at ¶ 14 (Def.'s App. at p. 105).

Fundling received her first performance evaluation from Moore on August 12, 1994. (Pl.'s App. at pp. 15–23). Therein, Moore omitted any reference to Fundling's real estate difficulties. On the contrary, Moore noted that Fundling "[q]uickly gained the confidence of [TXI's] managers because of her willingness to work hard and her cooperative attitude," and further that "[c]onsidering her lack of experience she has performed very well and needs minimum supervision."[3] *Id.* at 2. (App. at p. 22). Following "Fundling's August 12, 1994[,] performance evaluation, she received a salary increase to $65,000 per year, an increase of 13%, effective September 16, 1994." Pl.'s Resp. at p. 6 (citing Pl.'s App. at 24–25). Fundling then "received her second formal performance review from [ ] Moore on June 15, 1999." *Id.* (citing Pl.'s App. at 26–29). This second review contains no comments from Moore. *Id.* Thereafter, "[e]ffective June 14, 1999, [ ] Fundling received a merit salary increase to $74,796.00 per year, an increase of 15 percent." *Id.* (citing Pl.'s App. at p. 30).

"From December 2, 1991 until September 7, 1999, [ ] Moore and [ ] Fundling were the only full-time in-house attorneys employed by the Legal Department of TXI." Pl.'s Resp. at p. 10 (citing Fundling decl. at ¶ 22 (Pl.'s App. at p. 132)). However, "[i]n 1998, TXI dramatically increased its operations with the collateral effect of significantly increasing the legal department's work load." Moore decl. at ¶ 20 (Def.'s App. at p. 107). Subsequently, Moore began planning for the addition of another attorney to the legal department. Notably, during "Fundling's performance evaluation in June 1999, [ ] Moore and [ ] Fundling discussed the possibility of [Moore] hiring another in-house attorney. At that time, [ ] Moore told [ ] Fundling that depending on how much the new attorney would be paid, he would adjust her salary accordingly."[4] Pl.'s Resp. at p. 11 (citing Pl.'s App. at p. 31); *see also* Fundling dep. at p. 86, l. 9 to p. 88, l. 11 (Def.'s App. at p. 159).

Thereafter, TXI apparently began preparations for the additional hire. "Just as [he] did before hiring Fundling, [Moore] went to the Vice President of Human Resources ... and asked that the compensation group conduct a market survey to determine a competitive salary for the new attorney position given the experience level [he] sought." Moore decl. at ¶ 25 (Def.'s App. at p. 7). After that, in April 1999, "a Job Description for a Grade 14 Attorney was drafted in preparation for Defendant's anticipated hire of a new attorney." Pl.'s Resp. at p. 11; *see also* Moore dep. at p. 114, ll. 1–11 (Pl.'s App. at p. 95). Moore "decided to offer the new attorney a start-

---

**3.** Moore also stated that "[d]ue to her willingness to accomodate [sic] everyone who requested her service she doesn't prioritize well. (neither do I by the way)," and that "[Fundling] is intelligent and picks up quickly what the company's requirements are in the transactions she handles. She needs to force herself to take a [second] or third look at her documents to see if they can be improved despite the time pressure to get them out."

**4.** "Moore also informed the Human Resources Department that, depending on what it took to bring in the new attorney and after observing the performance of the new attorney and as compared to Fundling, Fundling's salary would be adjusted if the salary gap was too large based on the comparative abilities of the two attorneys." Def.'s Mot. at pp. 7–8.

ing salary of approximately $100,000 annually. . . ." Additionally, in its ad listing, TXI stated that it sought "a corporate attorney for a diverse in-house practice," with a background of "5–8 years legal experience."[5] (Pl.'s App. at p. 32). Specifically, the required background included "experience in corporate transactions, general contracts and real estate, financing and merger, acquisition and securities." Although several individuals applied for the position, Moore "screened them down from 30 to about 12. . . ." Moore dep. at p. 117, ll. 14–24 (Def.'s App. at p. 8). After further interview rounds with various executives, TXI reached a consensus decision to choose Schlenker. *Id.* at p. 118, l. 2 to p. 122, l. 17 (Def.'s App. at pp. 9–10).

Moore extended the position to Schlenker at an initial salary of approximately $100,000. Moore decl. at ¶ 32 (Def.'s App. at p. 110). While Schlenker rejected this "starting offer," Moore adjusted the salary (as well as additional benefits) to an amount more suitable to Schlenker. *Id.* (Def.'s App. at pp. 110–11); *see also* Schlenker dep. at p. 68, l. 16 to p. 76, l. 25; Moore dep. at p. 125, ll. 2–23 (Def.'s App. at pp. 28–30; 32). Eventually, the parties reached agreement, and "[o]n August 20, 1999, [ ] Moore offered [ ] Schlenker the job as an attorney with an annual salary of $115,000.00." Pl.'s Resp. at p. 12 (citing Pl.'s App. at p. 34("Schlenker Offer of Employment")). Schlenker then called Moore and accepted that offer. Schlenker dep. at p. 79, ll. 11–21 (Def.'s App. at p. 31). At the time TXI hired Schlenker, Fundling earned an annual salary of $74,796.00. *See* Moore decl. at ¶¶ 26, 32, 45 (Def.'s App. at pp. 109, 110–11, 114).

After TXI hired Schlenker, he received projects directly from Moore. *Cf.* Moore decl. at ¶ 34 (Def.'s App. at p. 111) Both parties agree that Moore transferred some of Fundling's responsibilities to Moore. *See* Fundling decl. at ¶¶ 27–28 (Pl.'s App. at p. 133); Moore decl. at ¶¶ 36–37 (Def.'s App. at pp. 111–12). The reasons why Schlenker received certain projects-including work originally assigned to Fundling remains a disputed issue between the parties. Plaintiff charges Moore sexually discriminated against Fundling, *see, e.g.,* Pl.'s App. at 36–37, while Defendant maintains it distributed assignments according to experience, and redistributed assignments to familiarize Schlenker with TXI. *See* Moore dep. at p. 126, l. 16 to p. 127, l. 12; Moore decl. at ¶ 37 (Def.'s App. at pp. 11; 112). Regardless, on October 1, 2001, Fundling filed a charge of sex discrimination with the Texas Commission on Human Rights and the EEOC "alleging unequal pay claims under both the [EPA] and Title VII". Pl.'s Resp. at p. 14 (citing Pl.'s App. at p. 36–37). Afterward, "[o]n October 15, 2001, [ ] Fundling received a merit salary increase to $95,000.00 per year, an increase of 27 percent." *Id.* (citing Pl.'s App. at p. 38).

In January 2002, Moore conducted Schlenker's first performance review, Moore decl. at ¶ 47 (Def.'s App. at p. 115), and "[o]n January 21, 2002, [ ] Schlenker received a merit salary increase to $124,000 per year, an increase of 7.8 percent." Pl.'s Resp. at p. 14 (citing Pl.'s App. at p. 45).

Later that year, "[i]n October 2002, the Board of Directors for Texas Industries, Inc., the publicly traded parent corporation of [TXI], voted Schlenker to be the Assistant Secretary for [TXI]." Moore

5. TXI's ad listing omitted any references to salary amount or grade level. (*See* Pl.'s App. at p. 32).

decl. at ¶ 51 (Def.'s App. at p. 116). Schlenker, however, did not receive notice of his promotion until approximately eight months later in May 2003. *See* Moore dep. at p. 133, ll. 8–14; p. 134, l. 24 to p. 136, l. 21 (Pl.'s App. at pp. 97; 98–100). "As a result of the creation of [their] job descriptions, [ ] Fundling now reported to [ ] Schlenker, as the Assistant General Counsel, as well as to [ ] Moore, as the General Counsel." Pl.'s Resp. at p. 15 (citing Pl.'s App. at pp. 48–50).

In May 2003, Moore conducted Fundling's third formal performance evaluation. Therein, Moore referenced incidents relating back not only to Fundling's previous evaluation, but to events occurring at her employment inception. (*See* Pl.'s App. at pp. 51–57). Shortly thereafter, "[o]n May 22, 2003, [ ] Fundling received a merit salary increase to $100,000 per year, an increase of 5 percent." Pl.'s Resp. at p. 15 (citing Pl.'s App. at p. 58). Fundling did not receive any additional formal performance evaluations or salary increases subsequent to this date.

"On May 29, 2003, [ ] Moore conducted a formal performance evaluation for [ ] Schlenker." Pl.'s Resp. at p. 15; *see also* Pl.'s App. at pp. 59–64. Therein, Moore states that he has not "clearly delineated [Schlenker's] role from [Fundling's]." Subsequently, "[f]ollowing his promotion to Senior Attorney/Assistant General Counsel, [ ] Schlenker received a salary increase to $138,000.00 per year, an increase of 11.3 percent." Pl.'s Resp. at p. 15 (citing Pl.'s App. at pp. 45, 65).

Finally, on August 19, 2003, "[t]he EEOC filed this lawsuit on Fundling's behalf." *See* Def.'s Mot. at p. 11. Six months later, "[o]n February 20, 2004, Fundling submitted her resignation to TXI." *Id.*

## II. Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and of identifying those portions of the record that demonstrate such an absence. *Id.* However, all evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

Once the party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party defending the motion for summary judgment cannot defeat the motion unless he provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent a summary judgment. *Id.* at 248–50, 106 S.Ct. 2505; *Abbott v. Equity Group, Inc.,* 2 F.3d 613, 619 (5th Cir.1993). In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United*

*Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (en banc).

If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he bears the burden of proof at trial, summary judgment is mandatory. *Celotex Corp.,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Washington v. Armstrong World Indus., Inc.,* 839 F.2d 1121, 1122 (5th Cir.1988). A motion for summary judgment cannot be granted simply because there is no opposition, even if the failure to oppose it violates a local rule. *Hibernia Nat'l Bank v. Adminstracion Central Sociedad Anonima,* 776 F.2d 1277, 1279 (5th Cir.1985). However, when the non-movant fails to provide a response identifying the disputed issues of fact, the Court is entitled to accept the movant's description of the undisputed facts as *prima facie* evidence of its entitlement to judgment. *Eversley v. MBank Dallas,* 843 F.2d 172, 173–174 (5th Cir.1988); *Nordar Holdings, Inc. v. W. Sec. (USA) Ltd.,* No. 3:96–CV–0427–H, 1996 WL 739019, *2 (N.D.Tex. Dec. 18, 1996).

Furthermore, the Court has no duty to search the record for triable issues. *Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise matter in which the evidence supports his or her claim." *Id.* A party may not rely upon "unsubstantiated assertions" as competent summary judgment evidence. *Id.*

Finally, the Fifth Circuit admonishes that "[w]hen dealing with employment discrimination cases, which usually necessarily involve examining motive and intent, ... granting of summary judgment is es-

pecially questionable. In these cases 'summary judgment should be used cautiously and all procedural requirements given strict adherence....'" *Hayden v. First Nat'l Bank,* 595 F.2d 994, 997 (5th Cir.1979) (quoting *Lavin v. Illinois High School Ass'n,* 527 F.2d 58, 61 (7th Cir. 1975)); *cf. Thornbrough v. Columbus & G. R. Co.,* 760 F.2d 633, 639 (5th Cir.1985) (citing Mendez, *Presumptions of Discriminatory Motive in Title VII Disparate Treatment Cases,* 32 Stan. L.Rev. 1129 (1980)) ("Unless the employer is a latter-day George Washington, employment discrimination is as difficult to prove as who chopped down the cherry tree.").

## III. Equal Pay Act

 Under the Equal Pay Act ("EPA"), an employer is prohibited from discriminating "between employees on the basis of sex ... for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions." 28 U.S.C. § 206(d)(1) (1978). To establish a *prima facie* case under the EPA, a plaintiff must demonstrate that (1) her employer is subject to the EPA; (2) she performed work in a position requiring equal skill, effort and responsibility under similar working conditions; and (3) she was paid less than members of the opposite sex providing the basis for comparison.[6] *Jones v. Flagship Int'l,* 793 F.2d 714, 722–23 (5th Cir.1986); *Williams v. Tex. Dep't of Trans.,* 1997 WL 53142, at *5 (N.D.Tex.1997). Plaintiff need not show that her job duties were identical to those of higher paid male employees, only that the "skill, effort and responsibility" required in the performance of the compared

---

**6.** *See Hodgson v. Am. Bank of Commerce,* 447 F.2d 416, 420 (5th Cir.1971) (*"Any* wage differential between the sexes, no matter how small and insignificant, is sufficient under the statutory prohibition.") (emphasis added).

jobs are "substantially equal." *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir.1987); *Williams*, 1997 WL 53142, at *6.[7]

When a plaintiff succeeds in establishing her *prima facie* case, the burdens of production and persuasion shift to the employer to demonstrate one of the four affirmative defenses specified under the EPA. *Plemer v. Parsons–Gilbane*, 713 F.2d 1127, 1136 (5th Cir.1983).[8] In other words, the burden shifts to the employer once a plaintiff shows she was paid less than a male who was performing substantially the same job. *Id.* The EPA provides exceptions, sometimes referred to as affirmative defenses, for disparate wage payments made pursuant to: (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality; or (4) a differential based upon any factor other than sex. *Peters*, 818 F.2d at 1153 (citing 29 U.S.C. § 206(d)(1)).

### a. *Prima Facie* Case

As Defendant concedes it is subject to the EPA, and that Fundling "was paid at a lower rate than Schlenker during her employment," *see* Def.'s Br. at p. 3, the core issue is whether Fundling "performed work in a position requiring equal skill, effort and responsibility under similar working conditions." *Jones*, 793 F.2d at 722. Although "[w]hat constitutes equal skill, equal effort, or equal responsibility cannot be precisely defined ... [t]he terms constitute separate tests, each of which must be met in order for the equal pay standard to apply." 29 C.F.R. § 1620.14(a) (2004). Moreover, "[i]t should be kept in mind that 'equal' does not mean 'identical.' Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." *Id.* Finally, "it is the overall job, not individual segments, that must form the basis of comparison. Thus, even if a portion of [male and female] jobs overlapped, this would not be enough to prove and [sic] EPA violation." *Kern v. GE Capital Info. Tech. Solutions*, 2003 WL 22433817 at *5 (N.D.Tex. Feb. 19, 2003).

At the outset, Defendant concedes that "[f]rom a global perspective, Fundling and Schlenker's jobs were similar. Both were attorneys in TXI's legal department reporting to the General Counsel," and "[m]any of the types of work handles by Fundling and Schlenker overlapped." Def.'s Br. at p. 4. Nonetheless, Defendant argues further that "this Court need only look at the realities of the work performed by Fundling and Schlenker" in determining that the two were *not performing* equal work requiring equal skill, effort and responsibility under similar working conditions. Def.'s Reply at p. 3. Defendant then details a laundry list of assignments Schlenker performed, including a large lease transaction, a technical patent infringement lawsuit, and a hydrocarbon contamination project. *See* Def.'s Br. at pp. 5–6; *see also* Allen dep. at p. 30, l. 11 to p. 31, l. 21; Moore decl. at ¶ 38; ¶ 39 (Def.'s App at pp. 57; 112; 112–13). Defendant ends this argument announcing that because "Schlenker shouldered more responsibility as he handled the more complex legal matters," Fundling cannot prove

---

**7.** Unlike a claim arising under Title VII, a plaintiff in an EPA case need not demonstrate discriminatory intent. *Id.*

**8.** Unlike a claim arising under Title VII, the plaintiff does not retain the ultimate burden of persuasion in an Equal Pay Act case. In an Equal Pay Act case, the employer, not the employee, must prove the actual wage disparity is not sex linked. *Plemer*, 713 F.2d at 1136.

that "she and Schlenker performed 'equal work' in jobs requiring equal skill, effort and responsibility." Def.'s Br. at p. 7.

Although Plaintiff also details a laundry list of assignments Fundling performed, it *begins* its argument by stating that "[i]n determining the equality of the requirements of the job held by Fundling and Schlenker, the Court need look no further than their job descriptions, ... [which] demonstrate that the two positions are substantively identical." Pl.'s Resp. at p. 22. Admittedly, in some cases, job descriptions may be a factor in EPA claims. *See Brennan v. Owensboro–Daviess County Hospital,* 523 F.2d 1013, 1017 (6th Cir. 1975) [hereinafter *Owensboro* ], *cert. denied* 425 U.S. 973, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976).

> Although job descriptions should not be accorded as much weight as that given to the duties *actually* performed by employees in determining whether jobs are substantially equal ... they may be helpful, particularly where the description of the jobs to be compared are similar and were written by the very employer who claims that the wage differentials are not based on an impermissible criterion.

*Id.* (emphasis added). However, *Owensboro* recognized also that the duties *actually* performed must be accorded more weight than job descriptions. *Id.* Indeed, the regulations find job *content* controlling. *See* C.F.R. § 1620.13(e) (2004). "Application of the equal pay standard is not dependent on job classifications or titles but depends rather on *actual* job requirements and performance." *Id.* (emphasis added).

In this case, Plaintiff accords too much weight to the job descriptions for two reasons. First, the Court finds the job descriptions list responsibilities in very general terms. For instance, both descriptions include the responsibility of "[preparing] and [executing] legal documents by analyzing, drafting, negotiating, reviewing, and filing these documents." Pl.'s App. at pp. 33, 50. Other general responsibilities include "[studying] proposed and existing legislation, [reviewing] business practices and policies, and [advising] management of potential risks." *Id.* Such descriptions provide merely an overview of legal projects, rather than the minutiae of daily activity. As such, their utility with respect to equality of job requirements is minimized.

Second, the job descriptions do contain some differences. In fact, each carries responsibilities the other does not. To wit, only Fundling's responsibilities include the preparation of SEC forms. Pl.'s App. at p. 50. In contrast, while both descriptions include the responsibility of "[carrying] out broad legal assignments that are complex and difficult in nature," Schlenker may do so under "minimal supervision," while Fundling may do so under "appropriate supervision." Pl.'s App. at pp. 33, 50. Therefore, in this case, while the job descriptions furnish helpful background information, they do not provide the necessary details this Court needs to make a proper comparison.

In sum, the Court finds it must address actual job performance to determine whether Schlenker and Fundling performed substantially similar work. In this regard, Plaintiff details a variety of assignments Fundling performed, including restructuring companies into partnerships, overseeing environmental compliance, enabling cash management bank agreements and executing equipment leases. *See* Fundling decl. at ¶ 6; 8; Allen dep. at pp. 28, ll. 10–19; p. 31, l. 22 to p. 32, l. 7; Fundling decl. at ¶ 12 (Pl.'s App. at p. 7; Def.'s App. at pp. 56; 57; Pl.'s App. at p. 130).

Defendant counters Plaintiff's view of Fundling by highlighting her admission that Schlenker handled more complex matters. *See* Def.'s Repl. at p. 1–2 (citing Fundling dep. at p. 172 (Def.'s App. at p. 174)). Defendant argues that such an admission combined with Schlenker's experience proves that Schlenker's position required greater skill and effort. However, at this point, the comparison is between the actual *performance,* which may or may not include experience and skill. As the regulation instructs, "[p]ossession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill. The efficiency of the employee's performance in the job is not in itself an appropriate factor to consider in evaluating skill." C.F.R. § 1620.13(e) (2004).

At this point, the Court cannot state affirmatively that as a matter of law, the skill and effort of Schlenker and Fundling were substantially *dis*similar. While Defendant offers transactions and situations to differentiate Schlenker's position, it does not provide competent summary judgment evidence as to *why* and *how* such items are substantially dissimilar from those Fundling performed. While some differences existed, the record does not demonstrate the necessary substantiality with respect to these prongs.[9]

Nevertheless, the Court does find that substantial differences in job responsibility existed between Schlenker and Fundling. "Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a) (2004). In this situation, there can be no dispute Schlenker exercised more responsibility than Fundling. No statement illustrates this more than Fundling's own admission that Schlenker handled the more complex matters at TXI. *See* Fundling dep. at p. 172, ll. 12–20 (Def.'s App. at p. 174). Such an admission goes far beyond Schlenker's *listed* responsibilities; rather, it reveals what actually *occurred,* and eliminates any need for speculation.[10]

Furthermore, the Court finds additional evidence of Schlenker's elevated level of responsibility. For instance, Defendant states that "[b]ecause of [Schlenker's] prior experience as the General Counsel of a publicly traded company, Moore also designated Schlenker as Acting General Counsel during [Moore's] two-month leave of absence for knee surgery," and that "Fundling was never designated as Acting General Counsel and she never had the responsibility to act as the General Counsel on TXI's behalf." Def.'s Resp. at p. 6 (citing Moore decl. at ¶¶ 41, 43 (Def.'s App. at pp. 113, 113–14)). Indeed, prior to Schlenker's employment, Moore vaca-

---

**9.** Moreover, Moore's own admission draws some doubt on such a finding. *See* Moore dep. at p. 148, ll. 11–14 ("[Fundling] kept saying that she wanted to know the difference between what she was doing and Wes was doing. And I said a lot of the times there's no difference in what you're doing. But I had hired Wes to be able to handle stuff that I handled.") (Def.'s App. at p. 13).

**10.** The Court finds Plaintiff's reliance on *Brennan v. Prince William Hospital Corp.,* 503 F.2d 282 (4th Cir.1974) [hereinafter *Prince William*], inexpedient. While it may be true

that "[h]igher pay is not related to extra duties when ... [q]ualified female employees are not given the opportunity to do the extra work," *id.* at 286 (citing *Shultz v. Wheaton Glass Co.,* 421 F.2d 259 (3rd Cir.1970)), the Court deems such language inapplicable to this case. Aside from conclusory allegations, Plaintiff fails to proffer competent summary judgment type evidence establishing that TXI or Moore excluded Fundling from opportunities. Rather, the evidence establishes that Moore delegated assignments based on experience and skill.

tioned for shorter periods, and scheduled his "vacation at times when [he] knew the Company was not involved in complex transactions." Moore decl. at ¶ 42 (Def.'s App. at p. 113). Moreover, during such times, "if complex general counsel level questions arose while [Moore] was on vacation and if [he] could not be reached, TXI's Vice Presidents had full authority to contact designated outside counsel." *Id.* at ¶ 43 (Def.'s App. at pp. 113–14). Whatever Fundling's duties included during such times, they were a far cry from the full responsibility and authority Schlenker exercised "on TXI's behalf that [was] associated with the General Counsel position." *Cf.* Moore decl. at ¶ 41 (Def.'s App. at p. 113). As such, the Court finds that the relative responsibility that Schlenker and Fundling exercised cannot be deemed substantially similar. Hence, as the evidence demonstrates a lack of this factor, Plaintiff cannot establish a *prima facie* case under the EPA. *See Christopher v. State of Iowa,* 559 F.2d 1135, 1138 n. 14 (8th Cir.1977) ("The requirements of equal sill, equal effort and equal responsibility are considered to constitute three separate tests, each of which must be met in order for the equal pay standards to apply.") (internal citations omitted).

However, even were the Court to find that Fundling performed work in a position requiring equal skill, effort and responsibility under similar working conditions, Defendant still proffers a valid exemption.

#### b. Exemptions

At the outset, it must be remembered that "[a]n exemption from the coverage of the Act must be narrowly construed." *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041, 1047 (1973) (internal citations omitted); *see also Corning Glass Works v. Brennan,* 417 U.S. 188, 207, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) ("The [EPA] is broadly remedial and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve."). Nevertheless, courts recognize valid exemptions. Specifically, with regard to factors "other than sex," several determinants pass judicial muster, including "different job levels, different skill levels, previous training, and experience." *Pouncy v. Prudential Ins. Co.,* 668 F.2d 795, 802–03 (5th Cir.1982). Courts also consider other factors such as "prior salary history, performance, and competitors' offers," finding these factors to be "legitimate, nondiscriminatory reasons for paying [employees] different amounts." *Lyons v. Burlington Coat Factory Warehouse,* 2004 WL 515585, at *6, 2004 U.S. Dist. LEXIS 3575, at *16–17 (N.D.Tex. 2004).

Defendants proffer three determinants for the differences in pay: (1) Schlenker's experience, particularly his securities and general counsel experience; (2) Schlenker's performance of more complex legal work; and (3) TXI's dynamic legal situation. In turn, each explanation supports the other listed reasons. Nevertheless, each reason is an independent rationale which employers may consider when making salary decisions. Additionally, the record corroborates that TXI established Schlenker's grade and salary before it made the hiring decision. As such, while this may not be a determinant in and of itself, it buttresses the validity of the previous three rationales. Finally, Plaintiff presents no evidence that Defendant utilized such reasons as pretexts for determination.

#### 1. Specialized Experience

■ As Defendant notes, experience qualifies as a valid "other than sex" factor for pay differentials. Clearly, Schlenker brought with him a wide variety of experi-

ence that Fundling did not possess. Although not exhaustive, Schlenker's background included real estate and financing experience, *see* Schlenker dep. at p. 49, l. 18 to p. 50, l. 16; Moore decl. at ¶ 31 (Def.'s App. at pp. 24; 110); *see also* Pl.'s App. at p. 74–75 ("Schlenker Resume"), involvement in working with a publicly traded company, *see, e.g.,* Moore decl. at ¶ 31 (Def.'s App. at p. 110); Schlenker Resume, implementation of a patent program, *see* Schlenker dep. at p. 43, l. 3 to p. 44, l. 20 (Def.'s App. at p. 23), and significant securities experience, including specific expertise with the 1933 Securities Act. *See* Schlenker Resume; Moore decl. at ¶ 31 (Def.'s App. at p. 110); *cf.* Schlenker dep. at p. 43, l. 3 to p. 44, l. 20 (Def.'s App. at p. 23). The latter experience is most significant as Fundling concedes that before the hiring decision, Moore acknowledged openly he sought an attorney with more securities experience in this area. *See* Fundling dep. at p. 209, l. 22 to p. 212, l. 16 (Def.'s App. at pp. 183–84). Moreover, Schlenker utilized much of his expertise and experience shortly after being hired. *See, e.g.,* Moore decl. at ¶ 38 (Def.'s App. at p. 112) ("[Moore] assigned Schlenker a highly technical patent infringement lawsuit with cross claims and third party claims contesting the patent ... With little or no supervision, Schlenker took the lead and ultimately negotiated a very favorable result for TXI.").

Additionally, Schlenker brought with him approximately five years experience as general counsel of a publicly traded company. *See* Schlenker Resume. Again, the Court finds great significance in this experience as Moore states specifically he "sought an attorney who had General Counsel experience...." Moore decl. at ¶ 24 (Def.'s App. at p. 108).

Finally, as Plaintiff concedes that Schlenker encompassed experience and skill which Fundling did not, there is no need to examine the ability Fundling possessed. The affirmative defenses to the APA do not mandate a "substantiality" requirement. As the Supreme Court exhorted: "Under the [EPA], the courts and administrative agencies are not permitted to substitute their judgment for the judgment of the employer ... who [has] established and applied a bona fide job rating system, so long as it does not discriminate on the basis of sex." *County of Washington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981) (internal citations omitted); *see also Hodgson v. Golden Isles Convalescent Homes, Inc.,* 468 F.2d 1256, 1258 (1972) ("Congress intended to permit employers wide discretion in evaluating work for pay purposes."). Nevertheless, even if the Court were to incorporate "substantiality" into the affirmative defense, sufficient evidence exists proving experience and skill Schlenker possessed and utilized was more than extraneous or random. Hence, Plaintiffs cannot succeed by arguing that Schlenker's experience and skill were utilized in an insignificant manner.

In sum, the Court cannot ignore the immense experience Schlenker brought to the table, nor can it ignore the fact that Schlenker utilized much of his experience at TXI. Furthermore, the Court recognizes fully that Schlenker possessed much expertise and experience which Fundling did not. *See, e.g.,* Fundling dep. at p. 62, l. 19 to p. 63, l. 1; p. 69, ll. 16–23; p. 82, ll. 4–10; p. 82, l. 25 to p. 83, l. 7 (Def.'s App. at pp. 153; 154; 158; 158). As experience qualifies as a bona fide exemption to the EPA, the Court finds that Defendant establishes its affirmative defense.[11]

---

11. Plaintiff complains vociferously about De- fendant's use of the term "market forces"

## 2. Complex Legal Work

■ Added to Schlenker's expertise and experience is Fundling's admissions that Schlenker handled the more complex work at TXI since his arrival. *See* Fundling dep. at p. 172, ll. 7–20 (Def.'s App. at p. 174). This admission is quite logical because of Schlenker's skills and experience which Fundling did not possess. The *actual* performance of Schlenker's added skill level lends explains and justifies the pay differentials between Schlenker and Fundling. Again, the Court need not make quantitative determinations with respect to *how much* complex legal work Schlenker performed. There is no sliding scale to calculate pay disparities according to the level of complex work performed, nor should one exist. Furthermore, the Court need not concern itself with deciding equitable pay disparities; the law does not require such an analysis. It is enough to note that Schlenker handled the more complex legal work at TXI since the beginning of his employment. Such a determination qualifies as a valid affirmative defense.

## 3. Changing Legal Status

■ Finally, the Court recognizes TXI's dynamic legal situation as a valid justification for wage disparities. As stated earlier, "[i]n 1998, TXI dramatically increased its operations with the collateral effect of significantly increasing the legal department's workload." Moore decl. at ¶ 20 (Def.'s App. at p. 107). TXI acquired several operations that triggered finance operations involving a private placement and a public offering of stock. *Id.* Additionally, the acquisitions "all occurred within a short time period after TXI merged with Chaparral Steel via a public tender for its outstanding stock." *Id.* These substantial business dealings caused an influx of securities and financing work to TXI's legal department. Notably, these dealings brought with them complexities and situations novel to Fundling's skills and experience. *Compare* Moore decl. at ¶¶ 22–23 (Def.'s App. at pp. 107–108) *with* Fundling dep. at p. 56, ll. 9–15; p. 58, ll. 20–22; p. 76, l. 7 to p. 77, l. 19; p. 82, ll. 19–24; p. 115, ll. 6–17 (Def.'s App. at p. 151; 152; 156; 158; 161). Hence, sufficient reason existed for TXI to seek an attorney with those skills and expertise. Moreover, the decision to offer the incoming attorney a higher wage than Fundling is not subject to judicial alteration as the reason offered was for a valid business judgment *other than sex.* Accordingly, the Court finds TXI's dynamic legal situation an acceptable affirmative defense.

## 4. Preset Determinations

In addition to these determinants, solid evidence exists that Moore established the

---

when referring to the pay differentials between Schlenker and Fundling. *See* Pl.'s Resp. at p. 31 ("[T]he Fifth Circuit has routinely disallowed such arguments that wage differentials could be justified because the salary paid to a newly hired employee was driven by market forces that must be expended to attract qualified individuals.") (citing *Siler–Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542, 549 (5th Cir.2001)). Plaintiff, however, takes liberties with its assertions. A thorough review of the caselaw reveals exactly what *type* of "market forces" behavior is prohibited. *Compare Brock v.* *Georgia Southwestern College*, 765 F.2d 1026, 1037 (11th Cir.1985) ("[T]he argument that women *qua* women may be paid less is exactly the kind of evil that the [EPA] was designed to eliminate, and has been rejected.") (citing *Brennan v. City Stores, Inc.*, 479 F.2d 235, 241 n. 12 (5th Cir.1973)) *with Horner v. Mary Inst.*, 613 F.2d 706, 714 (8th Cir.1980) ("[A]n employer may consider the market place value of the *skills* of a particular individual when determining his or her salary.") (emphasis added). In this case, Defendant's use of the term "market forces" fully comports with allowable behavior.

grade 14 classification and $100,000 per annum salary before Schlenker applied for TXI employment.[12] *See* Pl.'s App. at p. 31 ("Legal Department FY 2000 Salary Plan"). The increased grade and salary infer an attorney with more skill and experience than Fundling possessed. However, even if viewed as circumstantial, Moore's declaration, coupled with Schlenker's experience and Fundling's admissions solidify the notion that the grade and salary were more than red herrings.

Therefore, the Court finds substantial evidence and reason to accept Defendant's affirmative defenses. In sum, TXI proffers sufficient justification for its wage allocation under the EPA.

## IV. Title VII

Title VII provides that "it shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In a sex discrimination case, the plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The prima facie case, if established, raises a presumption of discrimination. The defendant must rebut this presumption by articulating a legitimate, nondiscriminatory reason for its actions. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "Moreover, Title VII incorporates that portion of

the [EPA] which permits dissimilar wages between men and women pursuant to (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production, or (4) a differential based on any other factor other than sex." Def.'s Br. at pp. 10–11 (citing *County of Washington,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751). If the defendant satisfies this burden, the presumption disappears, and the plaintiff must prove that the proffered reasons are a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) [hereinafter *Hicks* ]. The plaintiff retains the ultimate burden of persuasion throughout the case. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

In cases not involving discharge, a plaintiff must prove the following in order to establish a prima facie case of discrimination: (1) she belonged to a protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly-situated employees outside her protected class were treated more favorably under circumstances nearly identical to hers. *See Martin v. Kroger Co.,* 65 F.Supp.2d 516, 543 (S.D.Tex.1999); *see also Nieto v. L & H Packing Co.,* 108 F.3d 621, 623 (5th Cir. 1997); *Waggoner v. Garland,* 987 F.2d 1160, 1163–64 (5th Cir.1993); *Thornbrough,* 760 F.2d at 639; *Little v. Republic Refining Co., Ltd.,* 924 F.2d 93, 97 (5th Cir.1991).[13] As Defendant concedes the first three prongs, the Court need only address whether Schlenker qualifies as a

---

**12.** While Plaintiff highlights that TXI in fact hired Schlenker as a grade 13 employee, *see* Pl.'s Resp. at p. 12 (citing Durbin dep. at p. 69, ll. 19–21 (Pl.'s App. at p. 110)), it does not dispute Defendant's evidence of Moore's intention to hire Schlenker as a grade 14 employee. As TXI created the Legal Department FY 2000 Salary Plan *before* it made its

hiring decision, it is Defendant's evidence that deserves the proper spotlight.

**13.** Although *Waggoner, Thornbrough* and *Little* address discrimination from the viewpoint of the Age Discrimination in Employment Act ("ADEA"), courts apply a similar analysis when scrutinizing Title VII situations. *See Thornbrough,* 760 F.2d at 639 n. 4.

similarly situated employee with a circumstance nearly identical to Fundling.

■ Analogous to Plaintiff's APA claim, Defendant argues Schlenker cannot be considered as a similarly situated employee as "Schlenker was hired under different circumstances and with experiences and skill sets that Fundling did not have and that TXI valued." Def.'s Br. at p. 12. In response, Plaintiff repeats its previous arguments asserted in Plaintiff's APA assertions. See id. ("[Defendant's] claims of gender discrimination stems solely from Fundling's subjective belief that it was discriminatory to pay Schlenker more than she was paid. However, and as discussed more fully above, the circumstances between Fundling and Schlenker are not nearly identical. . . ."). As such, the Court need not entertain a repeat analysis of this issue. Rather, the Court reiterates that Schlenker's and Fundling's jobs were not substantially equal, and that under Title VII, Schlenker and Fundling were not similarly situated employees. Therefore, Fundling's Title VII claim also fails.

### a. Exemptions

■ However, even assuming arguendo that Schlenker and Fundling were similarly situated employees, Defendant offers a legitimate, nondiscriminatory reason for its actions. Specifically, that Schlenker's experience "necessarily demanded greater compensation." Def.'s Br. at p. 13. To wit, Defendant allocated a larger salary to Schlenker because of his skill set and general counsel background. In listing and arguing such reasons, Defendant essentially reiterates its previous arguments from Plaintiff's APA claim. The Court finds that such reasons satisfy the Defendant's burden of offering acceptable rationales for its actions. Therefore, Plaintiff must prove that the proffered reasons are a pretext for discrimination. See Hicks, 509 U.S. at 507, 113 S.Ct. 2742.

To establish pretext, Plaintiff cannot rely upon subjective belief that TXI discriminated against Fundling. See Price v. Marathon Cheese Corp., 119 F.3d 330, 337 (5th Cir.1997); Ray v. Tandem, 63 F.3d 429, 434 (5th Cir.1995). It must provide substantial evidence from which a reasonable inference can be draw that the Defendant's proffered reasons are false; a mere shadow of doubt is insufficient. EEOC v. Lousiana Office of Community Services, 47 F.3d 1438, 1444 (5th Cir.1995). In this case, there is no evidence indicating that Defendant's proffered reasons are false.

■ Plaintiff attempts to prove pretext by first asserting that Moore failed Fundling by not providing learning opportunities so that Fundling could gain the expertise and experience that Schlenker possessed. Such a response confuses the issue. Title VII does not guarantee plaintiffs that they must be given employment opportunities. Rather Title VII prohibits the employer from considering certain criteria, in this case sex, when making that employment decision. The issue is discrimination, not equitable advancement.[14]

In short, Plaintiff fails to produce substantial evidence from which this Court can infer that the Defendant's proffered reasons for the pay disparity were actually

---

14. Plaintiff alleges further that additional evidence proves Defendant's discriminatory animus toward Fundling. However, the Court finds otherwise. The comment that Moore threatened to make Schlenker "Fundling's supervisor if she persisted with her unequal pay claim," Pl.'s Resp. at p. 36, is sufficiently explained when put into context. See Moore dep. at p. 148, l. 8 to p. 149, l. 5 (Def.'s App. at p. 13). Additionally, the Court addressed previously any argument regarding Fundling's contributions to the legal department or Schlenker's expertise and need not repeat such analysis.

pretext for sex discrimination. In sum, Defendant's Motion for Summary Judgment with respect to Plaintiff's Title VII claims must be GRANTED.

## V. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.

**It is so ordered.**